Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 12, 2004        Decided April 2, 2004

No. 03-1129

EVERGREEN AMERICA CORPORATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO,
INTERVENOR

Consolidated with
03-1146

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Steven M. Swirsky* argued the cause for petitioner. With him on the briefs were *Elliot Jay Mandel* and *Michael F. McGahan.*

*Ruth E. Burdick*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Frederick L. Cornnell, Jr.*, Supervisory Attorney.

*Herzl S. Eisenstadt* argued the cause for intervenor. With him on the brief were *Ernest L. Mathews, Jr.* and *John P. Sheridan. Elizabeth A. Alexander* entered an appearance.

Before: EDWARDS, GARLAND and ROBERTS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: On June 20, 2002, the International Longshoremen's Association, AFL-CIO ("Union"), filed a representation petition with the National Labor Relations Board ("NLRB" or "Board"), pursuant to Section 9(c) of the National Labor Relations Act ("Act"), 29 U.S.C. § 159(c) (2000), seeking an election to become the exclusive bargaining agent for Port Captains, Assistant Port Captains, and Port Engineers employed by Evergreen America Corporation ("Evergreen" or "Employer"). The Employer opposed the proposed bargaining unit on the ground that the five persons in the unit were managerial employees and therefore excluded from coverage under the Act. Following a hearing, the Acting Regional Director issued a decision holding that the disputed employees were not excluded managers and ordered an election. *See Evergreen Am. Corp.*, N.L.R.B. Case No. 22-RC-12225 (Aug. 14, 2002) ("*Representation Decision*"), *reprinted in* Joint Appendix ("J.A.") 541-60. The Employer then sought review by the Board. A secret ballot election was held on September 10, 2002, and the ballots were impounded pending a decision from the Board. On October 18, 2002, the Board denied the Employer's request for review. On November 15, 2002, after the ballots had been counted, the Acting Regional Director certified the Union as the

exclusive bargaining representative of the employees in the contested unit.

In order to obtain judicial review of the Board's certification decision, Evergreen refused to recognize and bargain with the Union. Evergreen also refused to provide information sought by the Union relating to existing employee benefit plans. On January 9, 2003, the Union filed an unfair labor practice charge with the NLRB. A complaint was then issued, alleging that the Employer's refusals to bargain and furnish information violated sections 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a) (2000). The Employer filed an answer admitting the refusal to bargain, but challenging the validity of the Board's certification. The Board subsequently granted the General Counsel's motion for summary judgment, holding that the Employer had violated sections 8(a)(5) and (1) as charged. *See Evergreen Am. Corp.*, 338 N.L.R.B. 156, 2003 WL 1963885 (2003). Evergreen petitions this court for review of that order, and the Board cross-applies for enforcement.

The only issues on appeal are whether substantial evidence supports the Board's determination that the Port Captains, Assistant Port Captains, and Port Engineers in the contested bargaining unit are "employees" under the Act and whether the Board's determination is consistent with the Act. On the record at hand, we find no basis upon which to overturn the Board's judgment. We therefore deny Evergreen's petition for review and grant the Board's cross-application for enforcement.

## I. BACKGROUND

The hearing on the representation petition included testimony from Chia-Lin Chen, Evergreen's Junior Vice President and Marine Department head, Charles Meng, an Assistant Port Captain, Lie-Cheng Yang, a Port Captain, and Johnnie Chen, Manager of the Marine Section. The facts elicited at the hearing are largely undisputed. We reprint them here:

a. Background

The Employer is a New Jersey corporation, with its office located in Morristown, New Jersey. The Employer is a general shipping agent for Evergreen Marine Corporation ("EMC"), a company located in Taipei, Taiwan that owns and operates approximately 50 ships used to transport cargo in containers for its customers to various ports around the world. In the New York City area, EMC's ships berth at Maher Terminal, a 400-acre terminal in Elizabeth, New Jersey.

The Employer is responsible for the loading and unloading of EMC's vessels at Maher Terminal ("the Terminal"). Neither the Employer nor EMC own the Terminal. Rather, the Employer contracts with the Terminal for terminal services, meaning that the Terminal provides a berth for ships owned or chartered by EMC as well as stevedore services, meaning that the Terminal provides employees called "stevedores" to unload and load cargo. The stevedores are employees of the Terminal. Other shipping companies berth ships at the Terminal. Usually, three of EMC's ships arrive at the Terminal each week. After berthing in Elizabeth, the ship travels to other ports in Europe or on the East Coast of the United States, such as Baltimore or Savannah. On any given day, the Employer stores two or three thousand containers at Maher Terminal.

The five petitioned-for employees work in the Employer's Marine Section, which also includes a section manager, an assistant manager and a general staff person. The petitioned-for employees report to the New York City Marine Section Manager who reports to the Junior Vice-president who heads the Marine Department. The Marine Department Junior Vice-President also supervises the Marine Section Manager in Salt Lake City and the Marine Section Manager in Los Angeles. The Marine Department Junior Vice President reports to the Executive Vice-president for Marine and Logistics. In

its organizational chart, the Employer designates personnel at the level of Executive Vice-president and above as "management."

b.   The Port Captains

The parties have stipulated that the duties of the Port Captains and the Assistant Port Captain are the same. The Port Captains and Assistant Port Captain are responsible for preparing a schedule for unloading and loading the ship, preparing a plan for loading its cargo, acting as a liaison between the ship and the port, and monitoring the unloading and loading of cargo . . . .

The Port Captains remain at the Employer's Morristown office until a ship comes in. When a ship arrives, they work in the terminal, monitoring the loading and unloading of the ship. The Port Captain's manager records when the Port Captain leaves the office and returns from working in the terminal. The Port Captains have their own desks in Morristown, but do not have individual offices at the Morristown facility. The Port Captains' manager works in the Morristown office where he usually remains. The Port Captains must be available to management by phone at all times. The Port Captains' manager testified that the Port Captains contact him throughout the day to "keep [him] informed" on situations. The Port Captains' manager testified that Port Captains can handle routine matters, but they consult with him on non-routine matters or emergencies, matters involving significant costs and matters not covered by guidelines previously given to the Port Captains. The Employer has issued detailed descriptions of the Port Captain's functions, but concedes that these may not reflect actual practice. A Port Captain cannot approve payment of checks by the Employer's accounting department. In a conflict between the Port Captain and the Ship Captain or the Chief Mate, the ship personnel prevail.

i. Preparation of Prospect Reports

Approximately one week before a ship is scheduled to arrive at the Terminal, the Port Captain compiles a projected schedule for the ship's activity at the Terminal, called a prospect report. The prospect report includes the dates the ship will berth, the estimated time of arrival, the estimated time the ship will berth, the times that unloading and loading, referred to as "cargo activity," will begin and finish, the total number of container movements, the number of labor gangs ordered, the hours they will work and the estimated time of departure. Some of the information on the prospect report is supplied from various departments within the Employer. The Port Captain does not change the ship's overall schedule, which has been determined by the Employer's Project Department and cannot be changed without the agreement of the Port Captain's manager.

The Port Captain obtains the estimated time of the ship's arrival from the Project Department. It generally takes three and one-half hours after the ship arrives at the harbor to get to its berth in the Terminal. The Employer advises the Port Captain of the total number of containers to be unloaded and loaded, or container "movements."

The Port Captain adds to the prospect report the planned times that cargo activity will begin and end. He also adds the estimated number of labor gangs requested. He arrives at these figures by making mathematical calculations. He is limited by the ship's overall schedule. Normally a ship is in port for about 24 hours. He knows the number of containers that a crane can move within an hour. Pursuant to Terminal procedure, one labor gang works with each crane. He knows the number of cranes that can safely be operated on a ship. The number of container movements and the length of time that the ship will be berthed determine the number of

labor gangs he requests. For example, a Port Captain may be told that a ship can be in port 20 hours and will need 2,000 moves. He knows he must move 100 containers an hour and that a crane can move 25 moves per hours [sic], so he will figure on using four cranes and four labor gangs to move the containers.

The Junior Vice-President testified that in scheduling cargo activity, the Port Captain takes into account the start times of the stevedores, who start at 7 or 8 AM, 1 PM or 7 PM. He testified that the Port Captain tries to schedule cargo activity to avoid paying overtime costs, and to use the stevedores during the day when it is less expensive to pay them, as opposed to at night. The Port Captain may recommend that the Ship Captain speed up to arrive in the Terminal at a time that is economical for cargo activity.

The Port Captain's manager reviews each prospect report. At the beginning of each week, the Port Captain's Manager contacts an administrator at the Terminal to review with him the schedules of EMC's ships coming into the terminal that week. After Terminal personnel learn the schedules of all of its customers, a Terminal representative will contact the Port Captain to tell him how many cranes and workers will be available for each ship. If the Terminal advises that the number of stevedores is different than that requested by the Employer, the Port Captain will report this to his manager. If there is a conflict in which two vessels owned or chartered by EMC are scheduled to berth at the same time, the Port Captain's manager will decide how many gangs are assigned to each vessel.

The number of gangs assigned to a ship is ultimately decided between the Terminal manager and the Port Captain's manager. Subsequently, if a ship is behind schedule, the Port Captain may, in consultation with his Manager, request that the Terminal

provide additional labor to shorten the period of cargo activity.

ii.  Preparation of Stowage Plans

The process of loading cargo is termed "stowage." Prior to the arrival of a ship, the Port Captain prepares a stowage plan, which is a diagram showing the placement of cargo to be loaded onto the ship. In making the stowage plan, the Port Captain aims to load the cargo efficiently, and to load the ship to its maximum capacity while maintaining the ship's stability. The Port Captain starts with a computerized floor plan of the bays in the ship where cargo can be stored. EMC's ships have ten different floor plans. The Port Captain looks at the previous stowage plan's designation for the containers to be unloaded to determine what space will be available for loading. He is told the weight of the cargo the ship can handle. He contacts the Employer's Export Department to find out the size and weight of the cargo to be loaded. The Employer generally uses three sizes of containers. There may be oversized cargo to be loaded onto the ship. The Port Captain considers the sequence of ports in the ship's route. He plans to load heavier cargo at the bottom of the ship. The Port Captain takes into account the number of cranes available at the port where cargo will be unloaded. A Port Captain will spread out cargo to conform with the positioning and number of cranes at the destination port. The Port Captain also considers whether cargo is hazardous. He must follow federal regulations and the International Maritime Code in the manner these containers are handled. He must get approval from his manager if he deviates from these guidelines. He learns from the Employer whether containers must be kept refrigerated and therefore require access to electricity. The Port Captain knows where electrical outlets are located on the various ships. The Export Department advises him the day before the ship comes in if

military containers will be loaded and if so, the weight, size and destination of such containers.

The Employer gives the Port Captain specific guidelines as to how space on the ship is to be used. The Port Captain uses a computer to superimpose onto the floor plan a diagram showing where containers going to the various ports will be placed. He uses a hydrostatic table to evaluate the ship's stability after cargo is loaded according to the stowage plan.

If a ship will berth between 3:30 AM and 5:30 PM, the Port Captain must complete the stowage plan the night before the ship will berth. If the ship is to be berthed after 5:30 PM, the Port Captain must complete the plan before noon on that day. The Port Captain submits the stowage plan to his manager, and to his manager's supervisor for review. The Port Captain must review the stowage plan with the ship's Chief Mate, who is in charge of the ship's cargo, to determine if it is in conflict with a previous stowage plan.

iii. Liaison Between Ship and Port

The Port Captain notifies the Coast Guard 96 hours before a ship arrives to advise the Coast Guard of the ship's estimated time of arrival and departure. The Employer's Junior Vice President characterized this procedure as "routine." If the Coast Guard changes the ship's schedule, then the Port Captain must notify his manager. The Port Captain must tell the Coast Guard the names of the crew, and their date of birth, nationality and position aboard ship. The Coast Guard usually performs a safety inspection, during which the Port Captain is present. During such an inspection, the Coast Guard typically checks hazardous containers. If the Coast Guard finds unsafe conditions on the ship, the Port Captain will ask the Ship Master or Ship Engineer [to] repair the condition. The Port Cap-

tain may arrange for a surveyor, who is a licensed marine engineer designated by the Employer to inspect repairs. The Port Captain cannot authorize a repair. If a repair cannot be completed before the ship is scheduled to depart, the Port Captain will contact his manager.

The Employer has contracted with various vendors to supply services to the ship while it is in port, including a tugboat company to provide tugboats, a piloting company to provide pilots to maneuver the boat in the harbor, the Terminal to supply linemen to tie the ship to the terminal, and a husbandry agent to assist in clearing customs. The Marine Department Junior Vice-President, or the Junior Vice-President in conjunction with his supervisor, determines with which vendor the Employer contracts. EMC has contracted with a bunker oil supplier to provide bunker oil. The Ship Captain determines the number of tugboats needed. Each ship requires two pilots. EMC determines how much bunker oil will be supplied.

The Port Captain arranges for tugboats, pilots, linemen, a husbandry agent and bunker oil. These contacts are, as one of the Employer's witnesses acknowledged, routine. If a Port Captain learns that any vendor with whom the Employer has a standing arrangement cannot meet the needs of a particular ship, then the Port Captain notifies his manager. The Junior Vice-President may consult with the Port Captains as to the performance of the various services with whom the Employer contracts.

The Port Captain communicates with the Ship Captain. If the Ship Captain informs him that any crew members need medical attention, the Port Captain works with his manager to arrange this. He cannot arrange for medical attention on his own. If a crew member is not able to rejoin the ship, the Port Captain sees that the Immigration and Naturalization Service is contacted and advises his man-

ager of the change so that the manager can determine if a substitute crew member is needed. The Ship Captain may tell the Port Captain that he needs money, charts or maps.

iv.   Monitoring Unloading and Loading

The Port Captain monitors the unloading and loading of the ship by the stevedores. The Port Captain does not supervise the stevedores who are supervised by employees of the Terminal. There was a conflict between the parties' proffered evidence as to whether a Port Captain can, on his own, hire a "reefer," or refrigerator mechanic to assist in unloading refrigerated containers.

The Port Captain brings any significant errors involving unloading and loading to the attention of his manager. He investigates unloaded damaged containers and reports these to his manager. He does not make the determination as to whether to repair these containers. He has the discretion to determine whether to load a damaged container. The Port Captain may determine that time constraints do not permit loading all of the containers as planned. In such a case, the Port Captain may refrain from loading empty containers.

The Port Captain reports unusual incidents such as a stowaway to his manager. There was testimony at the hearing about an incident where a crew member did not show up at the ship's scheduled departure time. The Port Captain's manager decided that the ship could not sail.

The Port Captains' manager must approve any significant change in the stowage plan made after he has reviewed it. For example, if a customer asks for change in number of containers to be loaded at a particular port that will significantly impact upon the weight of the ship's cargo, then the Port Captain must notify his manager, as well as the ship's Chief Mate. Or, if the Port Captain determines that the

placement of a hazardous container pursuant to the stowage plan results in a potential unsafe condition, he consults with his manager to decide whether to withhold the hazardous container.

The Port Captain evaluates the stability of the ship with a hydrostatic table once the cargo has been loaded. The Chief Mate may adjust the ballast, a tank on the ship that can be filled with water to balance the ship, in response to the way the vessel is loaded or unloaded. The Port Captain may make a recommendation concerning the ballast.

v. Terms and Conditions of Employment

The Port Captain may sleep and take meals on the ship while it berths. The Port Captain is entitled to a meal allowance when his manager confirms that he worked on a shift that entitles him to such allowance.

The Port Captain does not attend management meetings. The Employer gives a gold lapel pin to its managers. The Employer does not give the Port Captains or the Assistant Port Captain these lapel pins. A Port Captain cannot authorize a visitor to board a ship, although his manager can give this permission.

The Port Captain usually works over 40 hours weekly. He does not get overtime pay. He does not punch a time clock. If he works a weekend day, he gets day off. If he works 24 hours straight through during the week, he gets four hours off.

vi. Education and Work Experience

The Employer requires the Port Captain to have the equivalent of a bachelor's degree in navigation. The Employer prefers that a Port Captain have experience as a ship captain.

b. The Engineer

The Engineer works in the Marine Section in the Employer's Morristown office until a ship arrives,

when he goes to the Terminal to see if the ship needs assistance with a mechanical problem. He works with the Ship Engineer to repair the ship, and may arrange for the purchase of parts or obtain the assistance of a mechanic. He does not actually perform a repair. He may communicate with the Coast Guard about an engine room failure or deficiency. He is in charge of updating maritime engineering certificates and insuring that a ship has a certificate of financial responsibility concerning pollution of the harbor. He reports to the Marine Section Manager. He does not punch a time clock. He has the equivalent of a bachelor's degree in engineering.

*See Representation Decision*, slip op at 3-13, J.A. 543-53.

Following the hearing, the Acting Regional Director issued a decision on August 14, 2002, finding that the Port Captains, Assistant Port Captains, and Port Engineers are not managerial employees. *Id.* at 13-18, J.A. 553-58. In reaching this result, the Acting Regional Director concluded:

I find no evidence that Port Captains formulate the Employer's business policies. I note that Port Captains work under the supervision of their manager on all but routine matters. The degree to which their actions are reviewed is inconsistent with managerial status. The evidence reveals that they lack the requisite discretion and judgment, independent of the Employer's established policies, necessary to confer managerial status upon them.

*Id.* at 14-15, J.A. 554-55 (citing *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 682-83 (1980)). The *Representation Decision* further held that,

[w]hile work that is based upon technical and professional competence must necessarily involve the exercise of discretion and judgment, technical and professional employees who exercise such discretion and judgment are not necessarily managerial employees.

*General Dynamics Corp.*, 213 N.L.R.B. 851, 857-58 (1974).

*Id*. at 14, J.A. 554. In the *General Dynamics* decision cited in the *Representation Decision*, the Board held:

Work which is based on professional competence necessarily involves a consistent exercise of discretion and judgment, else professionalism would not be involved. Nevertheless, professional employees plainly are not the same as management employees either by definition or in authority, and managerial authority is not vested in professional employees merely by virtue of their professional status, or because work performed in that status may have a bearing on company direction. Likewise, technical expertise in administrative functions which may involve the exercise of judgment and discretion does not confer executive-type status upon the performer. A lawyer or a certified public accountant working for, or retained by, a company may well cause a change in company direction, or even policy, based on his professional advice alone, which, by itself, would not make him managerial.

213 N.L.R.B. at 857-58. Finally, the *Representation Decision* concluded that the Port Engineer's "[m]ere exercise of discretion" did not endow him with managerial status. *Representation Decision*, slip op. at 18, J.A. 558. The Acting Regional Director ordered an election in the disputed unit, *id*. at 18-19, J.A. 558-59, and Evergreen filed a timely request for review.

On September 10, 2002, a secret ballot election was held, but the ballots were impounded pending the resolution of the Evergreen's request for review. On October 18, 2002, the Board denied Evergreen's request for review. The impounded ballots were then opened on November 13, 2002, and it was determined that the Union had received a majority of the votes cast. On November 15, 2002, the Acting Regional Director certified the Union as the exclusive bargaining representative of the employees. The Employer then filed a

motion for reconsideration with the Board, which the Board denied on January 8, 2003.

Evergreen refused to bargain with the Union, and the Union filed an unfair labor practice charge with the Board on January 9, 2003. Evergreen filed an answer admitting its refusal to bargain and attacking the validity of the Board's certification of the Union. On February 19, 2003, the NLRB General Counsel filed a motion for summary judgment, to which Evergreen responded by again challenging the validity of the certification. On April 25, 2003, the Board issued a Decision and Order granting the General Counsel's motion for summary judgment. The Board held that Evergreen violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a), by failing and refusing to recognize and bargain with the Union and by failing and refusing to provide the Union with information it sought from Evergreen. *Evergreen*, 2003 WL 1963885 at *3.

## II. ANALYSIS

### A. Standard of Review

In considering Evergreen's petition for review, we must ask whether the Board's determination that the Port Captains, Assistant Port Captains, and Port Engineers are "employees" under the Act "has warrant in the record and a reasonable basis in law." *Seattle Opera v. NLRB*, 292 F.3d 757, 761 (D.C. Cir. 2002); *see also NLRB v. Hearst Publ'ns*, 322 U.S. 111, 131 (1944). As the Supreme Court noted in *NLRB v. Yeshiva University*, "we accord great respect to the expertise of the Board when its conclusions are rationally based on articulated facts and consistent with the Act." 444 U.S. at 691. Under the Act, it is clear that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (2000). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *MECO Corp. v. NLRB*, 986 F.2d 1434, 1436 (D.C. Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Additional-

ly, the court will uphold the Board's decision upon substantial evidence even if we would reach a different result upon *de novo* review. *See Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 834-35 (D.C. Cir. 1998). In short, this court reverses for lack of substantial evidence "only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 961 (D.C. Cir. 2003) (quoting *United Steelworkers v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)). With this standard of review in mind, we turn to the principal findings supporting the Board's conclusion that the five employees are not managerial. We also address Evergreen's claim that the Board's decision cannot be squared with *Yeshiva*.

*B.   The Managerial Exclusion*

The Act only extends its protections and guarantees to those workers who meet the statutory definition of "employee." 29 U.S.C. § 152(3) (2000). In *NLRB v. Bell Aerospace Co., Div. of Textron, Inc.*, 416 U.S. 267 (1974), the Supreme Court held that Congress intended to exclude from the protections of the Act all employees properly classified as "managerial." *Id.* at 275. Employees are properly classified as "managerial" when they "formulate and effectuate management policies by expressing and making operative the decisions of their employer." *Id.* at 288 (quoting *Palace Laundry Dry Cleaning Corp.*, 75 N.L.R.B. 320, 323 n.4 (1947)); *accord Yeshiva*, 444 U.S. at 682; *Gen. Dynamics Corp.*, 213 N.L.R.B. at 857. The Supreme Court has made it clear that "employees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned" are not managers under the Act. *Yeshiva*, 444 U.S. at 690.

The Board's finding that Port Captains, the Assistant Port Captain, and the Port Engineer do not exercise managerial discretion is clearly supported by substantial evidence in the record as a whole and is consistent with the Act. The record shows that, in all but the most routine tasks, the Port Captains are tethered to the Section Manager. Assistant

Port Captain Meng and Port Captain Yang testified, without contradiction, that Port Captains follow strict policies and guidelines in performing their jobs, with constant direction from their manager.

Evergreen argues that the Board ignored evidence of Port Captains' discretion and authority over a ship's regional schedule. *See* Petitioner's Br. at 16. The Employer points to Junior Vice President Chen's testimony that, under certain circumstances, Port Captains may order extra gangs if needed. Hearing Tr. at 101, 178, 195-96. But Assistant Port Captain Meng's testimony established that the Employer's Project Department sets the ship's schedule, and that circumstances requiring a change of schedule should be reported to the manager. *Id.* at 270. Meng testified that he had never ordered extra gangs, and that he would not do this "unless [he had] the approval from the manager." *Id.* at 386. Meng also explained that, when a ship arrived behind schedule in the late evening and was scheduled to sail early the next morning, he had to consult with his manager about the additional gangs necessary to get the ship out. *Id.* at 379-92.

The Section Manager's close supervision of the Port Captains' purported exercise of discretion in the ordering of extra gangs was confirmed by Port Captain Yang's testimony. Yang testified that if two or more EMC ships unexpectedly berth at the same time, the labor adjustments are made by the manager in consultation with the terminal. *Id.* at 473-75. Yang also stated that he never ordered extra gangs on his own, and that the manager coordinated such tasks with the terminal supervisor. *Id.* at 474.

The record clearly establishes that Port Captains do not set a ship's schedule – they merely administer it in consultation with their manager. The Board considered the evidence that Port Captains exercise some discretion over a ship's schedule and estimate the number of labor gangs needed. *See Representation Decision*, slip op. at 14-15, J.A. 554-55. However, the Board reasonably concluded that this discretion is professional, not managerial. *Gen. Dynamics Corp.*, 213 N.L.R.B. at 857-58.

Evergreen also argues that the *Representation Decision* failed to recognize the discretionary authority of Port Captains over stowage plans. *See* Petitioner's Br. at 18. Both Junior Vice President Chia-Lin Chen and Section Manager Johnnie Chen testified that they need not approve the Port Captain's stowage plan before it takes effect, and that they review the plan after the stowage is completed. Hearing Tr. at 172, 490. But Meng's testimony established that, in practice, Port Captains follow specific guidelines in the preparation and execution of stowage plans. Meng reports to the manager after determining the location of reefers, which are considered special cargo. The manager, not the Port Captain, determines whether a reefer mechanic should be hired in such circumstances. *Id.* at 318. Meng also testified that when a customer requests a major change in the stowage plan, such as the shifting of 30 containers, he must report to his manager, who must approve the change. *Id.* at 323-24. According to Meng, Port Captains also receive instructions for loading or discharging hazardous cargos. The manager, not the Port Captain, decides when the hazardous cargo can be shipped. *Id.* at 330. Meng also stated that Port Captains are not authorized to fix any cargo problems without first reporting them to the manager. *Id.* at 441.

The record therefore supports the Board's finding that, "[a]s to the Port Captain's function of making arrangements for the ship in port . . . these functions are wholly routine and therefore do not characterize a managerial employee." *Representation Decision*, slip op. at 17, J.A. 557. Similarly, the Board reasonably determined that the Port Engineer does not exercise *managerial* discretion. *Id.* at 18. Nothing in the testimony of the Junior Vice President or the Section Manager undermines these conclusions.

We also reject the Employer's argument that *Yeshiva* compels reversal of the Board decision in this case. *Yeshiva* held that a university's full-time faculty members were managerial employees who were excluded from the protections of the Act. The Employer contends that, pursuant to *Yeshiva*, " 'managerial employee' . . . encompass[es] not just those who have authority to formulate policies, or to act independently

of them, but also those who represent management interests by *taking or recommending* discretionary action that effectively implement those policies." Petitioner's Br. at 15 (emphasis in the original). *Yeshiva* says no such thing. The *Yeshiva* decision acknowledges that the exercise of discretion is among the factors to be weighed in determining management status. However, the Court goes on to say:

> The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these. To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and the customers who will be served.

*Yeshiva*, 444 U.S. at 686.

The work of Port Captains, Assistant Port Captains, and Port Engineers does not come close to satisfying *Yeshiva*'s description of a "manager." The record in this case makes it clear that the Evergreen employees in question do not have "absolute authority" over anything – not even a ship's schedule. These employees exercise professional discretion in a few matters affecting the ships, but their decisions are closely monitored by and subject to the direction of the Section Manager. This is not analogous to the discretion exercised by the university professors in *Yeshiva*.

Finally, Evergreen argues that if the Union is allowed to represent the Port Captains, Assistant Port Captains, and Port Engineers, there will be a conflict of interest between the contested Evergreen employees and terminal stevedores, because the stevedores are represented by the same union as the employees in this case. Petitioner's Br. at 18. One rationale for excluding managerial employees from the Act's coverage is "[t]o ensure that employees who exercise discretionary authority on behalf of the employer will not divide their loyalty between employer and union." *Yeshiva*, 444 U.S. at 687-88. Evergreen claims that Port Captains' discretion over the number of stevedoring gangs used by Evergreen impacts the income of the stevedores, thus creating a conflict of interest. Petitioner's Br. at 18. This contention is meritless.

The stevedores work for a different employer, Maher Terminal, and they are in a different bargaining unit. We are aware of no authority, and Evergreen cites to none, supporting the proposition that such a purported cross-unit conflict may be relied upon to defeat the representational rights of employees who are not otherwise managers under the Act. Indeed, in an analogous situation, the Board has held that the potential for divided loyalty between inspectors and contractors working for two different employers did not render the inspectors managerial, even though the inspectors would be "represented by the same union which represents the employees whose work they inspect." *Bechtel, Inc.*, 225 N.L.R.B. 197, 198 (1976).

In light of the record as a whole, the Board reasonably rejected Evergreen's claim that its Port Captains, Assistant Port Captain, and Port Engineer are managerial employees. Accordingly, the Acting Regional Director properly directed the representational election leading to the Union's certification. And the Board did not err when it determined that Evergreen violated the Act in refusing to recognize and bargain with the Union and in refusing to provide information sought by the Union.

### III.   CONCLUSION

For the foregoing reasons, we deny Evergreen's petition for review and grant the Board's cross-application to enforce its order.