Opinion for the Court filed by Circuit Judge SENTELLE; Opinion dissenting in part filed by Circuit Judge HENDERSON.
SENTELLE, Circuit Judge.
Federated Logistics and Operations (“Federated” or “Employer”), a division of Federated Corporate Services, Inc., petitions this Court for review of a decision and order of the National Labor Relations Board (“Board”) in an unfair labor practice proceeding. Federated challenges Board determinations that it unlawfully made threats to, withheld wage increases from, and disciplined employees at one of its distribution facilities during a union organizing drive at its Tampa, Florida facility. Federated also challenges the broad order the Board imposed to remedy these unfair labor practices. For the reasons more fully set forth below, we deny the petition.
I. Background
Federated Logistics, which provides receipt, distribution and return services for Federated Department Stores, operates one of its fourteen distribution centers in Tampa, Florida. On August 25, 2000, the Union of Needletrades, Industrial and Textile Employees (“UNITE”) petitioned the Board to hold an election for the union to unionize the plant. When Federated management received the petition three days later, it flew its Vice President of Labor and Employee Relations from its Cincinnati, Ohio headquarters to Tampa to coordinate the company response to the organizing drive. Federated then launched a voluminous communications campaign with its Tampa employees. From August 28th, when it was notified of the election petition, through October 5th, the evening before the election, the Employer issued an open letter nearly every other day on the effects of unionization, generally organized in a “frequently asked question” format. In its August 29th letter, for example, Federated wrote:
CAN WE TRY UNION REPRESENTATION FOR A YEAR AND EASILY GET RID OF THE UNION AFTER THAT IF WE DON’T LIKE IT?
NO! If a union gets in, it will be very difficult, if not impossible, to get rid of the union.
Joint Appendix (“J.A.”) at 42. Federated arranged for the presence of specially trained managers from other facilities to speak one-on-one with employees about unionization. Finally, Joe Vella and Kevin Hart, two Federated vice presidents, convened nonmandatory group meetings with the Tampa employees two and four days before the election, to provide further information on unionization in a presentation based on a series of power-point slides.
The Union lost the October 6, 2000 election by a vote of 81 to 60. The Union filed objections to the election with the Board on October 13, 2000. On March 14, 2002, an administrative law judge (“ALJ”) held that Federated violated NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), by (1) maintaining a no-solicitation rule prohibiting solicitation in work areas during nonworking time; (2) interrogating employees about their union activities; (3) creating the impression among employees that their union activities were under surveillance; (4) soliciting an employee to attend and report back on a union meeting; (5) soliciting employee grievances with the implied promise to remedy them; (6) promising employees unspecified benefits if they defeated the union; and (7) threatening employees that supporting the Union would be futile, that they would lose benefits if the Union were elected, and that their wages would be frozen. Federated Logistics & Operations, 340 N.L.R.B. No. 36, slip op. at 20 *923 (2003) (“ALJ Decision”). The ALJ additionally found that Federated had violated NLRA § 8(a)(3), .29 U.S.C. § 158(a)(3), by (1) withholding a wage increase from employees because of their involvement in the election; and (2) disciplining two employees because they engaged in union activities. Id. at 20-21. The Board adopted the ALJ’s findings over Petitioner’s objections. As a remedy, the Board imposed a broad cease-and-desist order on Federated with respect to all the above-mentioned violations, ordered the employer to supply the Union with the names and addresses of employees for two years or until a certified election had been held, and ordered Federated to take various.affirmative actions to repair the effects of its no-solicitation rule, unlawful disciplining of employees, and withheld wage increase. The Board also directed that a Federated official or a Board agent in the presence of such an official read a Notice of Violation included in the Board opinion to an assembly of the Tampa employees.
Of the Board’s findings, Federated appeals only the determinations that it unlawfully threatened the Tampa employees with the futility of unionization, withheld wage increases, and disciplined employees in violation of NLRA § 8(a)(1) & (3), 29 U.S.C. § 158(a)(1) & (3). (Federated does not dispute the Board’s adoption of the ALJ’s finding that it committed the other six abovementioned unfair labor practices.) The Employer further challenges the Board’s imposition of what it characterizes as an “extraordinary” remedy, as unwarranted by the facts of the case.
II. Discussion

A Standard of Review

Under the NLRA, the Board’s findings of fact are conclusive “if supported by substantial evidence on the record considered as a whole .29 U.S.C. § 160(e). “Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Evergreen America Corp. v. NLRB, 362 F.3d 827, 837 (D.C.Cir.2004) (internal quotations omitted). This means that we must uphold the Board’s. decision even if we would have reached a different result upon de novo review. See Perdue Farms, Inc., Cookin’ Good Div. v. NLRB, 144 F.3d 830, 834-35 (D.C.Cir.1998). We appreciate our dissenting colleague’s-recitation of the evidence which serves to well illustrate the volume of substantial evidence upon which the Board relied. However, our colleague’s proposals as to how her findings would have differed from the Board’s on that evidence are not consistent with our limited role in review.

B. Unlawful threats

Federated’s first challenge is that the Board erred in finding that comments made by Vella and Hart amounted to unlawful threats of the futility of unionization in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), which forbids an employer from “interfering] with, restraining], or coercing] employees in the exercise” of their statutory rights under the Act.
Specifically, the ALJ found as fact that, during the course of a power point presentation to a large group of Tampa employees at informational meetings convened shortly before the election:
Vella and Hart did'inform the employees that bargaining would start at zero and that the Union would seek to take control of their 401(k) plan and that it was likely they would lose the 401(k) as the Union would bargain for control as it did at Respondent’s facility in Seacaucus, New Jersey. [Further,] Vella and Hart told the employees that the work could be moved in the event of a strike.
ALJ Decision at 14 (emphasis added).
The Board accepted these findings, characterizing them as follows:
*924 During employee meetings on October 2, and 4, ... Vella and Hart stated, with regard to what would happen to employees’ wages and benefits if the Union were selected, that “[they] would start from zero and would negotiate from that,” that the Union would strike, and that if a strike occurred the operation could be shut down and moved to another of the Respondent’s facilities in 3 days, and that employees could lose their 401(k) plan.
Id. at 1. Reviewing these comments “in context, to determine whether they ‘effectively threaten employees ... [,]’ ” id. at 2, the Board agreed with the ALJ that the comments “reasonably would be understood by employees as threats that benefits would be lost and that selecting union representation would be futile.” Id.
1. Substantial Evidence of Threatening Statements
Federated argues that there is insufficient evidence in the record to establish that its managers made statements constituting prohibited threats. Instead, the employer argues, the statements that the ALJ did establish it made fell within the safe haven created by NLRA § 8(c), 29 U.S.C. § 158(c), to protect employers’ free speech rights. Pet. Br. at 26.
Section 8(c) holds that:
The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.
29 U.S.C. § 158(c).
Therefore, “an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a ‘threat of reprisal or force or promise of benefit.’ ” NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (quoting NLRA § 8(c)). This means that “an employer is free ... to tell what he reasonably believes will be the likely economic consequences of unionization that are outside his control,” so long as the employer stops short of implying that it “may or may not take action solely on [its] own initiative for reasons unrelated to economic necessities ....” Id. at 618, 89 S.Ct. 1918. If the statements do amount to a threat under this test, whether or not they are true is inapposite. Macmillan Publishing Co. v. NLRB, 194 F.3d 165, 167 (D.C.Cir.1999). In essence, Federated is saying that the record lacks sufficient evidence to support a finding of a “threat of reprisal or force.”
As stated above, we must treat the Board’s findings as to questions of fact as conclusive “if supported by substantial evidence on the record considered as a whole ....” 29 U.S.C. § 160(e). This means that we will therefore uphold the Board’s findings with respect to the threatening nature of Vella’s and Hart’s comments if they are based upon “such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion.” Evergreen America Corp., 362 F.3d at 837. Insofar as these findings were based on credibility determinations by the ALJ, we will not reverse unless “those determinations are hopelessly incredible, self-contradictory, or patently unsupportable.” Shamrock Foods Co. v. NLRB, 346 F.3d 1130, 1134 (D.C.Cir.2003) (internal quotations omitted).
Because Federated is challenging the Board’s findings that Vella and Hart’s statements amounted to unlawful threats on the basis that they fall within § 8(c)’s protection, Federated must show no reasonable factfinder could find that the three managers made statements that amounted *925 to implications that, in the event of unionization, -Federated might take action on its own initiative to render unionization futile, for reasons unrelated to economic necessity. See Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918. Federated cannot meet this burden.
Federated first contends that the Board’s finding that “[Federated] threatened that the Union ‘would, strike[,]’ ” Pet. Br. at 27 (emphasis in brief), is protected under § 8(c), 29 U.S.C. § 158(c). Id. at 29 Alone, a prediction that a union would strike after being certified would not amount to a threat. See Hilton-Laughlin v. NLRB, 148 F.3d 1166, 1174 (D.C.Cir.1998) (noting that the Board itself has “found no unfair labor practice in such management statements as ... [after] ‘a vote for the [union] ... who' knows, we might wind [up] in another strike.’ ”). But in taking this comment out of context, Federated has blown its relevance out of proportion. The Board, adopting the ALJ’s conclusion, found that the comment that “the Union would strike” amounted to a threat of futility when viewed in combination with the managers’ other statements (that bargaining would start from zero, that work would be moved to another facility in the event of a strike, and that employees could lose their pensions and 401 (k) plans following unionization). See ALJ Decision at 1 (“[W]e agree with the judge that Beachy’s, Vella’s and Hart’s statements reasonably would be understood by employees as threats that benefits would be lost and that selecting union representation would be futile.”); id. at 14 (“All of [these comments] in combination w[ere] a threat to employees that it was futile to support the Union.”). Federated cannot show that the Board lacked substantial evidence to find that those other statements (a) were made and (b) together amounted to a threat that Federated might take action on its own initiative to render unionization futile.
As the ALJ correctly concluded, threats that bargaining would start from zero and benefits would be lost in the event of unionization amount to unlawful threats of futility. See Taylor-Dunn Mfg. Co., 252 NLRB 799, 800 (1980), enfd. without opinion, 679 F.2d 900 (9th Cir.1982); Noah’s Bay Area Bagels, LLC, 331 NLRB 188 (2000). A threat that the employer would move the Tampa facility’s work elsewhere in the event of a strike is an obvious threat of futility, given that it would depend on Federated “tak[ing] action solely on [its] own initiative .... ” Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918. The ALJ’s determination that the managers communicated that these events would come to pass in the event of unionization and/or a strike, which came down to a credibility determination between the testimony of the managers as against that of three employees at the meeting, see ALJ Decision at 13-14, is neither “hopelessly incredible, selfcontradictory, or patently unsupportable.” Shamrock Foods, 346 F.3d 1130 at 1134 (internal quotations omitted). This is true in light of not only the employees’ specific testimony that they were told these events would occur, ALJ Decision at 13, but also talking points ineludéd on the slides that hardly allow for an alternate interpretation of events. To give just a sample, the slides used at the meetings reminded the employees that “EVERYTHING you have now goes on bargaining table[,]” J.A. at 95; employees at one of the employer’s unionized facilities have no Federated pension or 401(K) plan, id. at 99; and the “Union will try to stop work here” followed by a statement that the “Company can protect itself by hiring new people or moving work.” Id. at 100.
2. Viewing the Statements in the Totality of the Circumstances
Urging that “the coercive tendencies of an employer’s conduct must be assessed *926 within the totality of the circumstances surrounding the occurrence at issue,” Pet. Br. at 22 (quoting Brown & Root, Inc. v. NLRB, 333 F.3d 628, 634 (5th Cir.2003)), Federated also argues that Vella’s and Hart’s comments do not violate NLRA § 8(a)(3), 29 U.S.C. § 158(a)(3), when viewed in the larger context of the employer’s overall communication with the Tampa employees. Pet. Br. at 21-22. Arguably, based on the language it chose to use in its decision, the Board did assess the comments at issue with the totality of the circumstances in mind. But we need not decide whether it was correct in doing so (and whether we should adopt the Fifth Circuit’s totality-of-the-circumstances test): substantial evidence supports the Board’s conclusion that the comments were unlawfully threatening when viewed either on their own or in context.
Though Federated maintains that its communication with employees was “deliberate,” “careful” and “balanced,” Pet. Br. at 5, in order to do so, Federated had to delve into the dozens of letters it distributed to the staff, and the slides Vella and Hart used in the employee meetings, for bits and pieces of positive language-such as assurances that it would engage in “give and take” bargaining with the union should it be elected-and cites them out of context. See, e.g., Pet. Br. at 23 (citing 12 separate references to the “give and take” nature of post-unionization bargaining in the letters and power point presentation); id. (providing two examples of the statement “we will respect your decision.”). It is true that the Board has previously held that statements such as those the Board found Vella and Hart to have made in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1)-e.g. that the employees would have to bargain from zero in the event of unionization-“are not violative of the [NLRA] when other communications make it clear that any reduction in wages or benefits will occur only as a result of the normal give and take of negotiations.” Taylor-Dunn, 252 NLRB at 800. But random citations do not a coherent view make. Federated’s attempt to lose us in the trees does not detract from the fact that a reasonable factfinder examining the textual record of the campaign-and even the specific instances where Federated used this supposedly neutral language-could conclude that the communications were designed to engender employee fears about potential loss of wages and benefits.
In a September 11, 2000, letter to employees, for example, Federated wrote:
Unionism means bargaining. Bargaining means “give and take.” And, give and take means that associates could get more, the same, or less when a union negotiates a contract. That’s right, less.
Letter of September 11, 2000, J.A. at 46 (emphasis in original). The slides upon which Federated based the presentation at the employee meetings on October 2nd-4th contained more of the same:
If the union is selected by a majority of voters, the union gets the right to participate in “give and take” bargaining
[Bargaining] “Does not start from where you presently are in wages, benefits, terms and conditions of employment”
EVERYTHING you have now goes on bargaining table — union will bargain with what you have now.
NO ONE can predict what will happen in bargaining
— MORE
— SAME
— LESS

ANYTHING IS POSSIBLE

Slides 21-23, J.A. at 94-95.
A reasonable factfinder would therefore not be compelled to conclude that the impact of Vella’s and Hart’s comments is mitigated by the overall communications *927 campaign. Although we are not called upon here to decide whether the letters and power point slides were, themselves, unlawfully threatening or coercive in violation of § 8(a)(3), 29 U.S.C. § 158(a)(3), the wording of the letters and the slides-notwithstanding the salutary use of phrases such as “give and take”-might bolster the conclusion that the. employees would be left with the impression that Federated was threatening futility.
In addition, the Board noted that Vella’s and Hart’s statements “were not made in circumstances free from other unfair labor practices.” ALJ Decision at 2 (quoting Noah’s Bay Area Bagels, 331 NLRB at 189). As recounted above, the Board found that Federated had committed seven other unfair labor practices which, it was reasonable for the Board to conclude, “len[t] additional coercive meaning to these managers’ statements.” Id.
Thus, Appellant’s challenge to the Board’s finding that Vella’s and Hart’s comments violated § 8(a)(3), 29 U.S.C. § 158(a)(3), would fail, regardless of whether we were to adopt the Fifth Circuit totality-of-the-circumstances test. Vella’s and Hart’s comments when viewed in context of the record as a whole remain adequate to support the Board’s conclusion that Federated was threatening the Tampa employees that electing the union would be futile.

B. Withheld Wage Increase

Federated’s second major challenge is that the Board erred in affirming the ALJ’s finding that the employer violated § 8(a)(1) & (3) by withholding a wage increase in response to the union campaign. 29 U.S.C. § 158(a)(1) & (3). Because this finding was supported by substantial evidence on the record as a whole, we cannot hold the Board in error.
The ALJ found that Federated “violated the [NLRA] by failing to grant a wage increase and by placing the onus on the Union for doing so,” ALJ Decision at 21, based on the following evidence: In April 2000, Federated management requested that two Tampa managers check the need to make seasonal wage adjustments for workers in the facility. Id. at 15. After a follow-up email on July 27, 2000, the two managers recommended a wage increase for both seasonal and regular employees on the basis that current wages were noncompetitive. Id. Senior Vice President Hart considered this recommendation in mid-August, and in September rejected the recommendation, saying that the Tampa facility was not having trouble attracting seasonal workers. Id.
As a general rule, while a union representation proceeding is pending, an employer must decide whether to grant benefits “precisely as it would if the union were not on the scene.” Perdue Farms, Inc. Cookin’ Good Division v. NLRB, 144 F.3d 830, 836 (D.C.Cir.1998). It follows that an employer may not withhold a wage increase that would have been granted but for a union organizing campaign. See also Pedro’s, Inc. v. NLRB, 652 F.2d 1005, 1008 n. 8 (D.C.Cir.1981).
Two pieces of circumstantial evidence reflected in the record provide a basis for the Board to adopt the ALJ’s finding that Federated withheld a wage increase because of the unionization campaign, and the Tampa employees’ involvement therein. First, Federated decided not to grant the wage increase in the middle of the unionization campaign. Second, by the first or second week of November, Federated was, by its own admission, encountering difficulty filling openings for seasonal employees, and had to hire temporary workers to meet demand for its services. ALJ Decision at 15. But what is more persuasive is the evidence cited by the ALJ that a Federated manager showed a *928 record of a wage increase at a non-unionized Federated facility in Georgia to Tampa employees, to make them aware of what would have happened at their facility if they had not been trying to unionize. See ALJ Decision at 17 (recounting testimony of five Tampa employees that managers brought a notice of a pay raise at Stone Mountain, Georgia around to them, and told them that they would have received a similar raise but for the union activity in Tampa). Arguably, an employer might be reluctant to raise wages shortly before a union election, lest it be accused of attempting to thereby influence the outcome of the election. Pedro’s Inc. v. NLRB, 652 F.2d at 1008 & n. 8. It is even possible, as Federated strenuously argues, that in mid-September, its managers simply did not foresee that it would have difficulty by early November in attracting enough workers to staff up the facility during the peak holiday season-although this conclusion is certainly not compelled by the record evidence. But the credited testimony of five Tampa employees that they were told by Federated managers they were not receiving wage increases being granted in other facilities because of the unionization effort is indisputably “relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion” that Federated’s purpose in withholding the wage increase was anti-union animus in violation of §§ 8(a)(1) & (3), 29 U.S.C. § 158(a)(1) & (3). Evergreen America Corp., 362 F.3d at 837.

C. Disciplining of Employees

The final Board finding that Federated challenges, again for lack of substantial evidence, is that Federated violated § 8(a)(3), 29 U.S.C. § 158(a)(3), by “issuing discriminatory warnings” to and suspending Tampa employees Emmanuel Williams and Sandra Lewis for engaging in § 7 activity. ALJ Decision at 3. Federated maintains that it suspended the employees — both active in the unionization effort — for harassing two Haitian workers on account of their country of origin. However, a memo kept by the human resources manager responsible indicated that her first and primary motive was disciplining the two employees for violating the Employer’s no-solicitation policy. ALJ Decision at 18-20.
Once again, the ALJ’s conclusion that the disciplinary actions violated the NLRA came down to a credibility determination in the face of conflicting testimony. ALJ Decision at 20. In crediting the word of Williams and Lewis over that of management, the ALJ relied not only on their testimonial evidence that they were disciplined for union solicitation, but also on the human resources memos relating that the reason management first confronted the two employees was to speak about their violation of the solicitation ban, see id. at 18. This evidence is therefore sufficient to support the Board’s adoption of the ALJ’s conclusion that Federated violated the Act in the manner in which it disciplined Williams and Lewis. Shamrock Foods Co. v. NLRB, 346 F.3d at 1134; Evergreen America Corp., 362 F.3d at 837.

D. Special remedies

Federated’s final challenge is to the Board’s choice of remedies. First, Federated challenges the cease and desist order that the Board imposed, requiring Federated to cease and desist from committing the unfair labor practices it was found to have committed, and “[i]n any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the [NLRA].” ALJ Decision at 5. Federated objects that the Board erred in imposing a broad order without addressing the suitability of “traditional remedies,” considering what Federated characterizes as its “ex *929 tensive efforts to comply with the law,” or adequately establishing that Federated’s violations were so egregious as to warrant an extraordinary remedy.
A cease and desist order as broad as that ordered by the Board in this case “is warranted only when a respondent is shown to have a proclivity to violate the [NLRA], or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees’ fundamental statutory rights.” NLRB v. Blake Construction, 663 F.2d 272, 285 (D.C.Cir.1981).
In applying that precedent to this record, it bears repeating that, in addition to the three Board findings that Federated unsuccessfully challenges in this appeal-that it unlawfully made threats of the futility of unionization, withheld a wage increase, and disciplined two employees for engaging in union aetivity-it is uncontested that Federated also committed six other unfair labor practices. As the Board found, “when faced with the Union organizing effort among its employees, [Federated] responded with extensive and serious unfair labor practices.” ALJ Decision at 3. These included maintaining an over-broad no-solicitation rule, interrogating employees about union activities, creating the impression of surveillance of union activities, asking employees to spy on union activities, soliciting employee grievances with the implied promise to remedy them, and promising employees unspecified benefits for defeating the union. Other courts have held similar patterns of violation to amount to “widespread” anti-union activity. See, e.g., Coil-A.C.C. Inc. v. NLRB, 712 F.2d 1074, 1076 (6th Cir.1983) (upholding a broad cease and desist order where the Board found the employer to have violated NLRA § 8(a)(1) by “threatening, coercing and restraining its employees in the exercise of their [§ 7] rights,” “threatening to [shut down] the company” and discharging an employee involved with the union). As the First Circuit has put it, “when a record discloses persistent attempts to interfere with legislatively protected rights by varying methods, the Board may restrain a labor organization from committing similar or related unlawful- acts in the future.” NLRB v. Union Nacional de Trabajadores, 540 F.2d 1, 11 (1st Cir.1976). Given the scope of Federated’s communications offensive against the Union, and the multiple unfair labor practices it committed in attempting to prevent the Union from winning the election, it was reasonable for the Board to conclude that its misconduct was sufficiently persistent and widespread to warrant a broad cease and desist order.
Federated next contests the Board’s order that it supply the Union with employees’ home contact details. See ALJ Decision at 4 (ordering that Federated “supply to the Union every 6 months for 2 years, or until a certification after a fair election, the names and addresses of its current unit employees, so that the Union can help to counteract the effects of the[ ] violations in its communications with employees.’-’). But it is long established that requiring the employer to disclose employee names and contact details to the union furthers NLRA objectives “by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses.” NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). Thus, this challenge fails.
Finally, Federated challenges the portion of the Board’s Order directing that either a Federated management official, or an agent of the NLRB in the presence of a Federatedi official, read the notice of Federated’s unfair labor practices to its employees. This Circuit has upheld such an *930 order with respect to the president of a corporation who the ALJ had found to have “personally and repeatedly communicated to employees [an] ominous threat” of plant closure as “the centerpiece of [defendant corporation’s] intense anti-union campaign.” Conair v. NLRB, 721 F.2d 1355, 1385-87 (D.C.Cir.1983). As we clarified in United Food & Commercial Workers v. NLRB, 852 F.2d 1344, 1348 (D.C.Cir.1988), “[w]e are not unconcerned about the ignominy of a forced public reading by an employer and its potential for oppression.” (internal quotation omitted). We will only “enforce such orders when the record ... indicate[s][a] particularized need” for one. Id. (internal quotation omitted). In the case at bar, as in Coñair, the Board found the fact that “many of the[ ] [NLRA] violations were committed by high-level management officials[J” ALJ Decision at 3. The Board explained that part of the purpose of its order that the Notice be read out loud was “so that employees will fully perceive that [Federated] and its managers are bound by the requirements of the [NLRA].” Id. at 4 (emphasis added). Federated has not met its burden of rebutting the existence of a particularized need for the public reading requirement. For that reason, we decline to reverse that portion of the order.
For the foregoing reasons, the petition for judicial review is denied.