# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2004        Decided February 25, 2005

No. 03-1323

FEDERATED LOGISTICS AND OPERATIONS, A DIVISION OF
FEDERATED CORPORATE SERVICES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITE, AFL-CIO-CLC,
INTERVENOR

———

Consolidated with
03-1357

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board

———

*Meir Feder* argued the cause for petitioner. With him on
the briefs were *Andrew M. Kramer* and *Julia M. Broas*.

*Robert J. Englehart*, Attorney, National Labor Relations
Board, argued the cause for respondent. With him on the brief

were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *David A. Fleischer*, Senior Attorney.

*James B. Coppess* argued the cause for intervenor. With him on the brief was *Ira J. Katz.*

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Opinion dissenting in part filed by *Circuit Judge* HENDERSON.

SENTELLE, *Circuit Judge*: Federated Logistics and Operations ("Federated" or "Employer"), a division of Federated Corporate Services, Inc., petitions this Court for review of a decision and order of the National Labor Relations Board ("Board") in an unfair labor practice proceeding. Federated challenges Board determinations that it unlawfully made threats to, withheld wage increases from, and disciplined employees at one of its distribution facilities during a union organizing drive at its Tampa, Florida facility. Federated also challenges the broad order the Board imposed to remedy these unfair labor practices. For the reasons more fully set forth below, we deny the petition.

## I. Background

Federated Logistics, which provides receipt, distribution and return services for Federated Department Stores, operates one of its fourteen distribution centers in Tampa, Florida. On August 25, 2000, the Union of Needletrades, Industrial and Textile Employees ("UNITE") petitioned the Board to hold an

election for the union to unionize the plant. When Federated management received the petition three days later, it flew its Vice President of Labor and Employee Relations from its Cincinnati, Ohio headquarters to Tampa to coordinate the company response to the organizing drive. Federated then launched a voluminous communications campaign with its Tampa employees. From August 28th, when it was notified of the election petition, through October 5th, the evening before the election, the Employer issued an open letter nearly every other day on the effects of unionization, generally organized in a "frequently asked question" format. In its August 29th letter, for example, Federated wrote:

> CAN WE TRY UNION REPRESENTATION FOR A YEAR AND EASILY GET RID OF THE UNION AFTER THAT IF WE DON'T LIKE IT?
>
> NO! If a union gets in, it will be very difficult, if not impossible, to get rid of the union.

Joint Appendix ("J.A.") at 42. Federated arranged for the presence of specially trained managers from other facilities to speak one-on-one with employees about unionization. Finally, Joe Vella and Kevin Hart, two Federated vice presidents, convened nonmandatory group meetings with the Tampa employees two and four days before the election, to provide further information on unionization in a presentation based on a series of power-point slides.

The Union lost the October 6, 2000 election by a vote of 81 to 60. The Union filed objections to the election with the Board on October 13, 2000. On March 14, 2002, an administrative law judge ("ALJ") held that Federated violated NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), by (1) maintaining a no-solicitation rule prohibiting solicitation in work areas during nonworking time;

(2) interrogating employees about their union activities; (3) creating the impression among employees that their union activities were under surveillance; (4) soliciting an employee to attend and report back on a union meeting; (5) soliciting employee grievances with the implied promise to remedy them; (6) promising employees unspecified benefits if they defeated the union; and (7) threatening employees that supporting the Union would be futile, that they would lose benefits if the Union were elected, and that their wages would be frozen. Federated Logistics & Operations, 340 N.L.R.B. No. 36, slip op. at 20 (2003) ("ALJ Decision"). The ALJ additionally found that Federated had violated NLRA § 8(a)(3), 29 U.S.C. § 158(a)(3), by (1) withholding a wage increase from employees because of their involvement in the election; and (2) disciplining two employees because they engaged in union activities. *Id.* at 20-21. The Board adopted the ALJ's findings over Petitioner's objections. As a remedy, the Board imposed a broad cease-and-desist order on Federated with respect to all the above-mentioned violations, ordered the employer to supply the Union with the names and addresses of employees for two years or until a certified election had been held, and ordered Federated to take various affirmative actions to repair the effects of its no-solicitation rule, unlawful disciplining of employees, and withheld wage increase. The Board also directed that a Federated official or a Board agent in the presence of such an official read a Notice of Violation included in the Board opinion to an assembly of the Tampa employees.

Of the Board's findings, Federated appeals only the determinations that it unlawfully threatened the Tampa employees with the futility of unionization, withheld wage increases, and disciplined employees in violation of NLRA § 8(a)(1) & (3), 29 U.S.C. § 158(a)(1) & (3). (Federated does not dispute the Board's adoption of the ALJ's finding that it committed the other six abovementioned unfair labor practices.)

The Employer further challenges the Board's imposition of what it characterizes as an "extraordinary" remedy, as unwarranted by the facts of the case.

## II. Discussion

### A. Standard of Review

Under the NLRA, the Board's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole . . . ." 29 U.S.C. § 160(e). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Evergreen America Corp. v. NLRB*, 362 F.3d 827, 837 (D.C. Cir. 2004) (internal quotations omitted). This means that we must uphold the Board's decision even if we would have reached a different result upon *de novo* review. *See Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 834-35 (D.C. Cir. 1998). We appreciate our dissenting colleague's recitation of the evidence which serves to well illustrate the volume of substantial evidence upon which the Board relied. However, our colleague's proposals as to how her findings would have differed from the Board's on that evidence are not consistent with our limited role in review.

### B. Unlawful threats

Federated's first challenge is that the Board erred in finding that comments made by Vella and Hart amounted to unlawful threats of the futility of unionization in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), which forbids an employer from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise" of their statutory rights under the Act.

Specifically, the ALJ found as fact that, during the course of a power point presentation to a large group of Tampa employees at informational meetings convened shortly before the election:

> Vella and Hart did inform the employees that *bargaining would start at zero* and that the Union would seek to take control of their 401(k) plan and that it was likely they would lose the 401(k) as the Union would bargain for control as it did at Respondent's facility in Seacaucus, New Jersey. [Further,] Vella and Hart told the employees that the *work could be moved in the event of a strike.*

ALJ Decision at 14 (emphasis added).

The Board accepted these findings, characterizing them as follows:

> During employee meetings on October 2, and 4, . . . Vella and Hart stated, with regard to what would happen to employees' wages and benefits if the Union were selected, that "[they] would start from zero and would negotiate from that," that the Union would strike, and that if a strike occurred the operation could be shut down and moved to another of the Respondent's facilities in 3 days, and that employees could lose their 401(k) plan.

*Id.* at 1. Reviewing these comments "in context, to determine whether they 'effectively threaten employees . . . [,]'" *id.* at 2, the Board agreed with the ALJ that the comments "reasonably would be understood by employees as threats that benefits would be lost and that selecting union representation would be futile." *Id.*

### 1. Substantial Evidence of Threatening Statements

Federated argues that there is insufficient evidence in the record to establish that its managers made statements constituting prohibited threats. Instead, the employer argues, the statements that the ALJ did establish it made fell within the safe haven created by NLRA § 8(c), 29 U.S.C. § 158(c), to protect employers' free speech rights. Pet. Br. at 26.

Section 8(c) holds that:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

Therefore, "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618 (1969) (quoting NLRA § 8(c)). This means that "an employer is free . . . to tell what he reasonably believes will be the likely economic consequences of unionization that are outside his control," so long as the employer stops short of implying that it "may or may not take action solely on [its] own initiative for reasons unrelated to economic necessities . . . ." *Id.* at 618. If the statements do amount to a threat under this test, whether or not they are true is inapposite. *MacMillan Publishing Co. v. NLRB*, 194 F.3d 165, 167 (D.C. Cir. 1999). In essence, Federated is saying that the record lacks sufficient

evidence to support a finding of a "threat of reprisal or force."

As stated above, we must treat the Board's findings as to questions of fact as conclusive "if supported by substantial evidence on the record considered as a whole . . . ." 29 U.S.C. § 160(e). This means that we will therefore uphold the Board's findings with respect to the threatening nature of Vella's and Hart's comments if they are based upon "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Evergreen America Corp.*, 362 F.3d at 837. Insofar as these findings were based on credibility determinations by the ALJ, we will not reverse unless "those determinations are hopelessly incredible, self-contradictory, or patently unsupportable." *Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1134 (D.C. Cir. 2003) (internal quotations omitted).

Because Federated is challenging the Board's findings that Vella and Hart's statements amounted to unlawful threats on the basis that they fall within § 8(c)'s protection, Federated must show no reasonable factfinder could find that the three managers made statements that amounted to implications that, in the event of unionization, Federated might take action on its own initiative to render unionization futile, for reasons unrelated to economic necessity. *See Gissel Packing,* 395 U.S. at 618. Federated cannot meet this burden.

Federated first contends that the Board's finding that "[Federated] threatened that the Union '*would* strike[,]'" Pet.Br. at 27 (emphasis in brief), is protected under § 8(c), 29 U.S.C. § 158(c). *Id.* at 29 Alone, a prediction that a union would strike after being certified would not amount to a threat. *See Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1174 (D.C. Cir. 1998) (noting that the Board itself has "found no unfair labor practice in such management statements as . . . [after] 'a vote for the [union] . . . who knows, we might wind [up] in another strike.'"). But in

taking this comment out of context, Federated has blown its relevance out of proportion. The Board, adopting the ALJ's conclusion, found that the comment that "the Union would strike" amounted to a threat of futility when viewed *in combination* with the managers' other statements (that bargaining would start from zero, that work would be moved to another facility in the event of a strike, and that employees could lose their pensions and 401(k) plans following unionization). *See* ALJ Decision at 1 ("[W]e agree with the judge that Beachy's, Vella's and Hart's statements reasonably would be understood by employees as threats that benefits would be lost and that selecting union representation would be futile."); *id.* at 14 ("All of [these comments] in combination w[ere] a threat to employees that it was futile to support the Union."). Federated cannot show that the Board lacked substantial evidence to find that those other statements (a) were made and (b) together amounted to a threat that Federated might take action on its own initiative to render unionization futile.

As the ALJ correctly concluded, threats that bargaining would start from zero and benefits would be lost in the event of unionization amount to unlawful threats of futility. *See Taylor Dunn Mfg Co.,* 252 NLRB 799, 800 (1980), *enfd. without opinion*, 679 F.2d 900 (9th Cir. 1982); *Noah's Bay Area Bagels, LLC*, 331 NLRB 188 (2000). A threat that the employer would move the Tampa facility's work elsewhere in the event of a strike is an obvious threat of futility, given that it would depend on Federated "tak[ing] action solely on [its] own initiative . . . ." *Gissel Packing,* 395 U.S. at 618. The ALJ's determination that the managers communicated that these events would come to pass in the event of unionization and/or a strike, which came down to a credibility determination between the testimony of the managers as against that of three employees at the meeting, *see* ALJ Decision at 13–14, is neither "hopelessly incredible, self-contradictory, or patently unsupportable." *Shamrock Foods*,

346 F.3d 1130 at 1134 (internal quotations omitted). This is true in light of not only the employees' specific testimony that they were told these events would occur, ALJ Decision at 13, but also talking points included on the slides that hardly allow for an alternate interpretation of events. To give just a sample, the slides used at the meetings reminded the employees that "EVERYTHING you have now goes on bargaining table[,]" J.A. at 95; employees at one of the employer's unionized facilities have no Federated pension or 401(K) plan, *id.* at 99; and the "Union will try to stop work here" followed by a statement that the "Company can protect itself by hiring new people or moving work." *Id.* at 100.

2. Viewing the Statements in the Totality of the Circumstances

Urging that "the coercive tendencies of an employer's conduct must be assessed within the totality of the circumstances surrounding the occurrence at issue," Pet. Br. at 22 (quoting *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003)), Federated also argues that Vella's and Hart's comments do not violate NLRA § 8(a)(3), 29 U.S.C. § 158(a)(3), when viewed in the larger context of the employer's overall communication with the Tampa employees. Pet. Br. at 21–22. Arguably, based on the language it chose to use in its decision, the Board did assess the comments at issue with the totality of the circumstances in mind. But we need not decide whether it was correct in doing so (and whether we should adopt the Fifth Circuit's totality-of-the-circumstances test): substantial evidence supports the Board's conclusion that the comments were unlawfully threatening when viewed either on their own or in context.

Though Federated maintains that its communication with employees was "deliberate," "careful" and "balanced," Pet. Br.

at 5, in order to do so, Federated had to delve into the dozens of letters it distributed to the staff, and the slides Vella and Hart used in the employee meetings, for bits and pieces of positive language–such as assurances that it would engage in "give and take" bargaining with the union should it be elected–and cites them out of context. *See, e.g.*, Pet. Br. at 23 (citing 12 separate references to the "give and take" nature of post-unionization bargaining in the letters and power point presentation); *id.* (providing two examples of the statement "we will respect your decision."). It is true that the Board has previously held that statements such as those the Board found Vella and Hart to have made in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1)–e.g. that the employees would have to bargain from zero in the event of unionization–"are not violative of the [NLRA] when other communications make it clear that any reduction in wages or benefits will occur only as a result of the normal give and take of negotiations." *Taylor-Dunn,* 252 NLRB at 800. But random citations do not a coherent view make. Federated's attempt to lose us in the trees does not detract from the fact that a reasonable factfinder examining the textual record of the campaign–and even the specific instances where Federated used this supposedly neutral language–could conclude that the communications were designed to engender employee fears about potential loss of wages and benefits.

In a September 11, 2000, letter to employees, for example, Federated wrote:

> Unionism means bargaining. Bargaining means "give and take." And, give and take means that associates could get more, the same, or less when a union negotiates a contract. <u>That's right, less</u>.

Letter of September 11, 2000, J.A. at 46 (emphasis in original). The slides upon which Federated based the presentation at the

employee meetings on October 2nd-4th contained more of the same:

> If the union is selected by a majority of voters, the union gets the right to participate in "give and take" bargaining

> [Bargaining] "Does not start from where you presently are in wages, benefits, terms and conditions of employment" . . .

> EVERYTHING you have now goes on bargaining table – union will bargain with what you have now.

> NO ONE can predict what will happen in bargaining
> - MORE
> - SAME
> - LESS

> ANYTHING IS POSSIBLE

Slides 21-23, J.A. at 94-95.

A reasonable factfinder would therefore not be compelled to conclude that the impact of Vella's and Hart's comments is mitigated by the overall communications campaign. Although we are not called upon here to decide whether the letters and power point slides were, themselves, unlawfully threatening or coercive in violation of § 8(a)(3), 29 U.S.C. § 158(a)(3), the wording of the letters and the slides–notwithstanding the salutary use of phrases such as "give and take"–might bolster the conclusion that the employees would be left with the impression that Federated was threatening futility.

In addition, the Board noted that Vella's and Hart's statements "were not made in circumstances free from other

unfair labor practices." ALJ Decision at 2 (quoting *Noah's Bay Area Bagels*, 331 NLRB at 189). As recounted above, the Board found that Federated had committed seven other unfair labor practices which, it was reasonable for the Board to conclude, "len[t] additional coercive meaning to these managers' statements." *Id.*

Thus, Appellant's challenge to the Board's finding that Vella's and Hart's comments violated § 8(a)(3), 29 U.S.C. § 158(a)(3), would fail, regardless of whether we were to adopt the Fifth Circuit totality-of-the-circumstances test. Vella's and Hart's comments when viewed in context of the record as a whole remain adequate to support the Board's conclusion that Federated was threatening the Tampa employees that electing the union would be futile.

### B. Withheld Wage Increase

Federated's second major challenge is that the Board erred in affirming the ALJ's finding that the employer violated § 8(a)(1) & (3) by withholding a wage increase in response to the union campaign. 29 U.S.C. § 158(a)(1) & (3). Because this finding was supported by substantial evidence on the record as a whole, we cannot hold the Board in error.

The ALJ found that Federated "violated the [NLRA] by failing to grant a wage increase and by placing the onus on the Union for doing so," ALJ Decision at 21, based on the following evidence: In April 2000, Federated management requested that two Tampa managers check the need to make seasonal wage adjustments for workers in the facility. *Id.* at 15. After a follow-up email on July 27, 2000, the two managers recommended a wage increase for both seasonal and regular employees on the basis that current wages were non-competitive. *Id.* Senior Vice President Hart considered this

recommendation in mid-August, and in September rejected the recommendation, saying that the Tampa facility was not having trouble attracting seasonal workers. *Id.*

As a general rule, while a union representation proceeding is pending, an employer must decide whether to grant benefits "precisely as it would if the union were not on the scene." *Perdue Farms, Inc. Cookin' Good Division v. NLRB*, 144 F.3d 830, 836 (D.C. Cir. 1998). It follows that an employer may not withhold a wage increase that would have been granted but for a union organizing campaign. *See also Pedro's, Inc. v. NLRB*, 652 F.2d 1005, 1008 n.8 (D.C. Cir. 1981).

Two pieces of circumstantial evidence reflected in the record provide a basis for the Board to adopt the ALJ's finding that Federated withheld a wage increase because of the unionization campaign, and the Tampa employees' involvement therein. First, Federated decided not to grant the wage increase in the middle of the unionization campaign. Second, by the first or second week of November, Federated was, by its own admission, encountering difficulty filling openings for seasonal employees, and had to hire temporary workers to meet demand for its services. ALJ Decision at 15. But what is more persuasive is the evidence cited by the ALJ that a Federated manager showed a record of a wage increase at a non-unionized Federated facility in Georgia to Tampa employees, to make them aware of what would have happened at their facility if they had not been trying to unionize. *See* ALJ Decision at 17 (recounting testimony of five Tampa employees that managers brought a notice of a pay raise at Stone Mountain, Georgia around to them, and told them that they would have received a similar raise but for the union activity in Tampa). Arguably, an employer might be reluctant to raise wages shortly before a union election, lest it be accused of attempting to thereby influence the outcome of the election. *Pedro's Inc. v. NLRB*,

652 F.2d at 1008 & n.8. It is even possible, as Federated strenuously argues, that in mid-September, its managers simply did not foresee that it would have difficulty by early November in attracting enough workers to staff up the facility during the peak holiday season–although this conclusion is certainly not compelled by the record evidence. But the credited testimony of five Tampa employees that they were told by Federated managers they were not receiving wage increases being granted in other facilities because of the unionization effort is indisputably "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion" that Federated's purpose in withholding the wage increase was anti-union animus in violation of §§ 8(a)(1) & (3), 29 U.S.C. § 158(a)(1) & (3). *Evergreen America Corp.*, 362 F.3d at 837.

## C. Disciplining of Employees

The final Board finding that Federated challenges, again for lack of substantial evidence, is that Federated violated § 8(a)(3), 29 U.S.C. § 158(a)(3), by "issuing discriminatory warnings" to and suspending Tampa employees Emmanuel Williams and Sandra Lewis for engaging in § 7 activity. ALJ Decision at 3. Federated maintains that it suspended the employees—both active in the unionization effort—for harassing two Haitian workers on account of their country of origin. However, a memo kept by the human resources manager responsible indicated that her first and primary motive was disciplining the two employees for violating the Employer's no-solicitation policy. ALJ Decision at 18-20.

Once again, the ALJ's conclusion that the disciplinary actions violated the NLRA came down to a credibility determination in the face of conflicting testimony. ALJ Decision at 20. In crediting the word of Williams and Lewis over that of management, the ALJ relied not only on their

testimonial evidence that they were disciplined for union solicitation, but also on the human resources memos relating that the reason management first confronted the two employees was to speak about their violation of the solicitation ban, *see id.* at 18. This evidence is therefore sufficient to support the Board's adoption of the ALJ's conclusion that Federated violated the Act in the manner in which it disciplined Williams and Lewis. *Shamrock Foods Co. v. NLRB*, 346 F.3d at 1134; *Evergreen America Corp.,* 362 F.3d at 837.

### *D. Special remedies*

Federated's final challenge is to the Board's choice of remedies. First, Federated challenges the cease and desist order that the Board imposed, requiring Federated to cease and desist from committing the unfair labor practices it was found to have committed, and "[i]n any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the [NLRA]." ALJ Decision at 5. Federated objects that the Board erred in imposing a broad order without addressing the suitability of "traditional remedies," considering what Federated characterizes as its "extensive efforts to comply with the law," or adequately establishing that Federated's violations were so egregious as to warrant an extraordinary remedy.

A cease and desist order as broad as that ordered by the Board in this case "is warranted only when a respondent is shown to have a proclivity to violate the [NLRA], or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *NLRB v. Blake Construction*, 663 F.2d 272, 285 (D.C. Cir. 1981).

In applying that precedent to this record, it bears repeating that, in addition to the three Board findings that Federated unsuccessfully challenges in this appeal–that it unlawfully made threats of the futility of unionization, withheld a wage increase, and disciplined two employees for engaging in union activity–it is uncontested that Federated also committed *six* other unfair labor practices. As the Board found, "when faced with the Union organizing effort among its employees, [Federated] responded with extensive and serious unfair labor practices." ALJ Decision at 3. These included maintaining an over-broad no-solicitation rule, interrogating employees about union activities, creating the impression of surveillance of union activities, asking employees to spy on union activities, soliciting employee grievances with the implied promise to remedy them, and promising employees unspecified benefits for defeating the union. Other courts have held similar patterns of violation to amount to "widespread" anti-union activity. *See, e.g., Coil A.C.C. Inc. v. NLRB*, 712 F.2d 1074, 1076 (6th Cir. 1983) (upholding a broad cease and desist order where the Board found the employer to have violated NLRA § 8(a)(1) by "threatening, coercing and restraining its employees in the exercise of their [§ 7] rights," "threatening to [shut down] the company" and discharging an employee involved with the union). As the First Circuit has put it, "when a record discloses persistent attempts to interfere with legislatively protected rights by varying methods, the Board may restrain a labor organization from committing similar or related unlawful acts in the future." *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 (1st Cir. 1976). Given the scope of Federated's communications offensive against the Union, and the multiple unfair labor practices it committed in attempting to prevent the Union from winning the election, it was reasonable for the Board to conclude that its misconduct was sufficiently persistent and widespread to warrant a broad cease and desist order.

Federated next contests the Board's order that it supply the Union with employees' home contact details. *See* ALJ Decision at 4 (ordering that Federated "supply to the Union every 6 months for 2 years, or until a certification after a fair election, the names and addresses of its current unit employees, so that the Union can help to counteract the effects of the[] violations in its communications with employees."). But it is long established that requiring the employer to disclose employee names and contact details to the union furthers NLRA objectives "by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses." *NLRB v. Wyman-Gordan Co.*, 394 U.S. 759, 767 (1969). Thus, this challenge fails.

Finally, Federated challenges the portion of the Board's Order directing that either a Federated management official, or an agent of the NLRB in the presence of a Federated official, read the notice of Federated's unfair labor practices to its employees. This Circuit has upheld such an order with respect to the president of a corporation who the ALJ had found to have "personally and repeatedly communicated to employees [an] ominous threat" of plant closure as "the centerpiece of [defendant corporation's] intense anti-union campaign." *Conair v. NLRB*, 721 F.2d 1355, 1385-87 (D.C. Cir. 1983). As we clarified in *United Food & Commercial Workers v. NLRB*, 852 F.2d 1344, 1348 (D.C. Cir. 1988), "[w]e are not unconcerned about the ignominy of a forced public reading by an employer and its potential for oppression." (internal quotation omitted). We will only "enforce such orders when the record . . . indicate[s] [a] particularized need" for one. *Id.* (internal quotation omitted). In the case at bar, as in *Conair*, the Board found the fact that "many of the[] [NLRA] violations were committed by high-level management officials[.]" ALJ Decision at 3. The Board explained that part of the purpose of its order that the Notice be read out loud was "so that employees will

fully perceive that [Federated] *and its managers* are bound by the requirements of the [NLRA]." *Id.* at 4 (emphasis added). Federated has not met its burden of rebutting the existence of a particularized need for the public reading requirement. For that reason, we decline to reverse that portion of the order.

For the foregoing reasons, the petition for judicial review is denied.

HENDERSON, *Circuit Judge*, *dissenting in part*: I join my colleagues in the majority except in two crucial respects. Because our role in reviewing the orders of the National Labor Relations Board (Board) requires us to do more than simply sign off on its unfair labor practice findings, *see, e.g., Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1303 (D.C. Cir. 2000) ("[O]ur review is not ' "a mere rubber stamp substituting judicial abdication for judicial review." ' " (quoting *Gen. Elec. Co. v. NLRB*, 916 F.2d 1163, 1168 (7th Cir. 1990) (quoting *NLRB v. Harvstone Mfg. Co.,* 785 F.2d 570, 574-75 (7th Cir. 1986)))) (Henderson, J., dissenting), or mechanically enforce its remedies, *see, e.g., Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1980) ("[T]his court is a reviewing court and does not function simply as the Board's enforcement arm."), I cannot join the decision to uphold the Board's finding that Federated Logistics & Operations (Federated) committed an unfair labor practice by threatening futility; nor do I agree with the Board's imposition of several "extraordinary" remedies. As the Board offered neither a reasonable explanation nor one based on substantial evidence in the record to support either, *see, e.g., Gen. Elec. Co. v. NLRB*, 117 F.3d 627, 630 (D.C. Cir. 1997), I believe that the former constitutes a misdiagnosis—which deprived Federated of its right to free expression protected by the Act—and the latter amount to punitive rather than remedial measures. I would therefore hold that Federated's petition should be granted in part and, accordingly, do not join sections II.A and II.D of the majority opinion.

## I.

Judicial review of the Board's findings of unfair labor practices is admittedly deferential but it is not "so deferential that the court will merely act as a rubber stamp for the Board's conclusions." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004) (citing *Pa. State Educ. Ass'n-NEA v. NLRB*, 79 F.3d 139, 148 (D.C. Cir. 1996)). Because the Board's findings of fact are, by statute, conclusive "if supported by substantial evidence on the record considered as a whole," 29

U.S.C. § 160(e), we will uphold them unless upon a review of the entire record we conclude that they are not supported by the required quotient of evidence "or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C. Cir. 1994) (internal quotation marks & citations omitted); *see also Stanford Hosp. & Clinics v. NLRB*, 370 F.3d 1210, 1212 (D.C. Cir. 2004) ("Our review is limited to determining whether the Board's findings of fact are supported by substantial evidence and, if so, whether the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case."). " 'Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' " *Evergreen Am. Corp. v. NLRB*, 362 F.3d 827, 837 (D.C. Cir. 2004) (quoting *MECO Corp. v. NLRB* 986 F.2d 1434, 1436 (D.C. Cir. 1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971))). We do not review just the evidence supporting the Board, however; we also review "anything in the record that 'fairly detracts' from the weight of th[at] evidence." *Gen. Elec. Co.*, 117 F.3d at 630 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (Tatel, J.); *accord CitiSteel USA, Inc. v. NLRB*, 53 F.3d 350, 355 (D.C. Cir. 1995) (Board must "provide . . . reasons for discounting the contrary evidence.").

Even under this deferential standard, I disagree with the majority that substantial record evidence supports the Board's finding that Federated's managers unlawfully threatened Federated's employees that unionization would prove futile. None of the statements made by vice presidents Joe Vella and Kevin Hart—that bargaining would start from "zero," that work could be moved to another facility in the event of a strike and that employees could lose their 401(k) plan following unionization—supports the Board's "threat" finding, whether

viewed independently or in the "totality of the circumstances."[1] Although the National Labor Relations Act (NLRA, Act), §§ 1 *et seq.*, as amended, 29 U.S.C. §§ 151 *et seq.*, makes it an unfair labor practice for employers "to interfere with, restrain, or coerce employees in the exercise of" their associational rights, *id.* § 158(a)(1), it also protects the employer's First Amendment right to express its views, including reasonable predictions about the consequences of unionization, so long as they "contain[] no threat of reprisal or force or promise of benefit," *id.* § 158(c). "[A] 'threat of reprisal' means a 'threat of retaliation' and this in turn means not a prediction that adverse consequences will develop but a threat that they will be *deliberately inflicted* in return for an injury—'*to return evil for evil.*' " *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994) (emphases in original) (quoting *NLRB v. Golub Corp.*, 388 F.2d 921, 928 (2d Cir. 1967) (Friendly, J.)).

Vella's and Hart's statements that bargaining with the Union would start from "zero" gave an accurate and lawful, albeit blunt, picture of the vagaries of the collective bargaining process. *See* Joint Appendix (J.A.) 299 ("Mr. Hart stated that we would start from zero and we would negotiate from that. Any benefits we may have at this time could be jeopardized in that proceeding."); J.A. 312 ("[W]e could start from ground zero . . . They said we'd be starting at zero. We might go up. We

---

[1] While the majority does not mention manager Jody Beachy's statement to one employee (Kathy Lee Gay) that wages would remain constant during negotiations with the Union, *see Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 1 (2003), *reprinted in* Joint Appendix (J.A.) 1; *see also* J.A. 347, I believe that the Board failed to evaluate this statement in the context of Federated's pronouncement in early October that, while wages and benefits would be "frozen" during negotiations, it nevertheless would continue to make " 'routine' past practice changes such as normal merit reviews," J.A. 60. *See* discussion *infra* at 5-6.

might end up getting less than what we're making now."); J.A. 354 ("I asked them how can they start off with zero . . . . They said the union can do [sic]."). The statements neither implied that Federated intended to bargain in bad faith nor threatened a strategy of slashing wages and/or benefits in advance of negotiations; they indicated only, and truthfully so, that what the process held for the employees—"more, the same, or less," J.A. 48; *see also* J.A. 95—was hard to predict at the outset. Their statements, moreover, made clear that whatever the final result, it would be the product of negotiations, not unilateral retaliatory action.

Neither do I find the statements that unionization might trigger a strike, a plant shut-down or loss of the employees' 401(k) plan unlawful. An employer walks a fine line in predicting the effect of unionization on its business, *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618-19 (1969), for its predictions must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond [its] control" and not leave the impression that it "may or may not take action solely on [its] own initiative for reasons unrelated to economic necessities and known only to [it]," *id.* at 618. But " '[m]ere references to the possible negative outcomes of unionization,' " *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1174 (D.C. Cir. 1998) (quoting *UARCO, Inc.*, 286 NLRB 55, 58 (1987); alteration in original), fall within section 8(c)'s protection, 29 U.S.C. § 158(c). While Vella and Hart may have walked the line, the evidence failed to demonstrate that they crossed it. The Board concluded that "unsupported employer predictions that a strike and then a plant shut down *will* follow a union victory are objectionable and unlawfully coercive," *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 2 (2003) (emphasis added), but the ALJ nowhere found that Federated *intended* to visit any of these "evils" on its employees, only that they were *possibilities*. *See id.* at 13 ("[M]anagement stated that they *could* shut the building down in 3 days and move

the operation elsewhere *if* negotiations were unsuccessful . . . ."); *id.* (employees "*could* lose their benefits and 401(k) plans) (emphasis added); *id.* at 14 ("work *could* be moved *in the event of* a strike") (emphasis added); *see also, e.g.,* J.A. 299 ("*If* we were to go on strike . . . they *could* shut [the building] down, move it elsewhere and just start back up again.") (emphasis added). Vella's and Hart's prediction that employees could lose their 401(k) plan, moreover, was squarely based on fact—*i.e.*, the terms of the Union's contract at Federated's Secaucus facility, J.A. 62, 99. *See Gissel Packing Co.*, 395 U.S. at 618. Because the managers' statements only alluded to "possible negative outcomes of unionization," *Flamingo Hilton-Laughlin*, 148 F.3d at 1174 (internal quotation marks omitted), the Board erred "by converting a possibility into a certainty, then declaring it a violation of the Act." *Gen. Elec. Co.*, 117 F.3d at 636; *see Flamingo Hilton-Laughlin*, 148 F.3d at 1174 (vacating violation because company president speculated about duration of negotiations based on what he "foresaw").

The Board itself acknowledged that statements like these "are not per se unlawful," *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 1; *see generally Shaw's Supermarkets, Inc. v. NLRB,* 884 F.2d 34, 37 (1st Cir. 1989) (citing Board orders that found "bargaining from scratch" language lawful based on "factual context[]"), but must be evaluated "in context" in order to assess

> whether they "effectively threaten employees with the loss of existing benefits and leave them with the impression that what they may ultimately receive depends in large measure upon what the Union can induce the employer to restore," or—conversely—whether they indicate that any "reduction in wages or benefits will occur only as a result of the normal give and take of collective bargaining."

*Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 1 (quoting *Plastronics, Inc.*, 233 NLRB 155, 156 (1977) & citing *Capitol EMI Music*, 311 NLRB 997, 1007-1008 (1993), *enfd.* 23 F.3d 399 (4th Cir 1994)); *see Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 2 ([T]he Board must consider the impact of particular employer statements in the context of surrounding circumstances . . . ."). The Board offered a variety of reasons for discounting the "surrounding circumstances" here, *id.*, none of which I find reasonable. Indeed, the Board began its analysis with a proposition that is flatly contradicted by the administrative record: It found that Vella's and Hart's statements "uttered on the eve of the election" had "maxim[um] . . . coercive impact" because Federated's counterbalancing non-coercive statements were made "weeks" earlier, *id.*, but Federated distributed campaign materials describing the "give and take" of the bargaining process *immediately* before as well as *after* the two meetings at which Vella and Hart made their predictions.[2]  The Board also stated that "any lawful message in the PowerPoint presentation by Vella and Hart to employees was counteracted by their express statements that bargaining would start from 'zero.' " *Id.* This *ipse dixit* is a peculiar one as it contradicts the

---

[2] Federated distributed a communication on October 2—the day of the first employee meeting—asking its employees to consider whether they "could . . . possibly get hurt from 'give and take' bargaining?" J.A. 59.  The next day, October 3, Federated distributed a communication stating that "if the union wins your vote, then wages and benefits become subject to 'give and take' bargaining." J.A. 60. The day of the second employee meeting, October 4, Federated distributed a communication stating that "[u]nionization means that the 'give and take' of bargaining will decide whatever happens," J.A. 61, and followed up the next day with a communication stating, "You can avoid the risks of 'give and take' bargaining . . . ." J.A. 63.  The election was not held until October 6.  *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 1.

commonsense audience view of printed text and oral presentation as complementary—not contradictory.

The Board also discounted the context in which Vella's and Hart's statements were made by observing that, while "a particular employer statement" may be "mitigated by other employer statements made at different times or places[,] [a]n employee might reasonably be influenced more by a coercive statement than by a different noncoercive statement." *Id.* As discussed above, however, Vella's and Hart's statements were not coercive to begin with, and, in my opinion, could not have become so if considered in the larger context as required. *See infra* notes 4 & 5. The Board made the further point that Vella's and Hart's "coercive" statements "were not made in circumstances free from other unfair labor practices." *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 2 (internal quotation marks & citation omitted). While Federated's separate unfair labor practices were without doubt part of the larger context in which Vella's and Hart's statements should have been considered, the Board did not explain how they negated Federated's repeated and consistent statements that bargaining is a " 'give and take' process" and that the "result would be the product of good-faith bargaining." *Id.*

In upholding the Board, the majority concludes that the managers' statements were coercive even if viewed in the "totality of the circumstances" because "random" citations to "neutral language" in the administrative record "do not a coherent view make."[3] Maj. Slip Op. at 11. A quip does not a "coherent view" make either, however, and if charges of cherry-

---

[3] Given that the Board was obligated to consider the statements in context, *see* discussion *supra* at 5-6, I find the majority's pondering whether the Board was "correct in doing so (and whether we should adopt the Fifth Circuit's totality-of-the-circumstances test)[]" beside the point. *See* Maj. Slip Op. at 10.

picking the record are to be tossed about, my colleagues would do well to duck. Taken as a whole the record does not reveal Federated's "neutral language" as mere platitudes within a larger campaign to threaten employees if they unionize. *See* Maj. Slip Op. at 11. Rather, in my view, the record is so full of such "neutral language" that the picture it paints is one of a coherent company campaign presenting a consistent and lawful message: collective bargaining is a "give and take" process and, while the company intends to bargain in good faith, the process carries burdens as well as benefits.[4]

I also reject the majority's observation that resolution of this issue "c[o]me[s] down to a credibility determination between the testimony of the managers as against that of three employees at the meeting." Maj. Slip Op. at 9. If that were the case, I would join the majority as it is settled that "[w]e accept the ALJ's credibility determinations that are adopted by the Board 'unless they are patently unsupportable.' " *Schaeff Inc. v. NLRB*, 113 F.3d 264, 266 (D.C. Cir. 1997) (quoting *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C. Cir. 1988)) (Henderson, J.). But credibility is *not* the issue. The issue is whether a reasonable person would consider the managers' statements to be unlawful threats of futility if unionization were to occur. *See Evergreen Am. Corp.*, 362 F.3d at 837. I say no.

---

[4] *See, e.g.*, J.A. 43 ("Bargaining is 'give and take' which means that you could get more, the same, or less. *No one can predict* what you may get or lose with unionism.") (emphasis added); J.A. 46 (" 'Collective bargaining' involves 'give and take.' Both union and management must bargain in good faith . . . ." ); J.A. 56 (if Union were to win, "the only thing it 'wins' is the right to participate in 'give and take' bargaining") J.A. 57 ("[T]he 'give and take' bargaining process can bring risks, as well as rewards."); *see also infra* note 5.

**II.**

The Board's remedial power under section 10 of the NLRA, which authorizes the Board upon finding an unfair labor practice to order the violator "to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of [the Act]," 29 U.S.C. § 160(c); *see United Food & Commercial Workers Int'l Union AFL-CIO v. NLRB*, 852 F.2d 1344, 1347 (D.C. Cir. 1988), "is a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964). Because the Board "draws on a fund of knowledge and expertise all its own," *Gissel Packing Co.*, 395 U.S. at 612 n.32, and following the United States Supreme Court's lead, *see Fibreboard Paper Prods. Corp.*, 379 U.S. at 216, we have repeatedly recognized that we owe Board remedial orders "special respect" and, consequently, our review of them is limited. *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1232 (D.C. Cir. 1992); *see, e.g., Cobb Mech. Contractors, Inc. v. NLRB*, 295 F.3d 1370, 1375 (D.C. Cir. 2002) ([T]he Board is accorded broad discretion in fashioning an appropriate remedy."); *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1009 (D.C. Cir. 1998) ("[A] reviewing court must give special respect to the Board's choice of remedy . . . ."); *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 399 (D.C. Cir. 1981) ("The Board's choice of remedies is entitled to a high degree of deference."); *see also Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 654 (D.C. Cir. 1997) ("Our review, both in theory and in practice, is quite deferential.") (Silberman, J., concurring). Nevertheless, we remain a *court of review*—limited though our role may be—and not merely the Board's Article III "enforcement arm." *Peoples Gas Sys., Inc.*, 629 F.2d at 42. Accordingly, as we have said, "[i]t is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is

remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Id.* In short, the Board's remedy must "be tailored to the unfair labor practice it is intended to redress," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984); *see Cobb Mech. Contractors, Inc.*, 295 F.3d at 1375, and when it comes to "extraordinary" remedies, the Board is obligated to explain why conventional ones do not suffice. *See Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1079 (D.C. Cir. 1996).

The Board tells us that it reserves extraordinary remedies for cases involving unfair labor practices that are "so numerous, pervasive, and outrageous" that "special" remedies are necessary to "dissipate fully the coercive effects of the unfair labor practices found." *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 2 (internal quotation marks & citation omitted). This is such a case, it concluded, because Federated engaged in "extensive and serious unfair labor practices," "some of" its "unlawful conduct pervaded the unit," its "unfair labor practices tended to have a long-term coercive impact on the unit," and "many of the[] violations were committed by high-level management officials." *Id.* at 3. Consequently, it imposed three "extraordinary" remedies to eliminate the effects of Federated's assorted unfair labor practices—(1) the company is to cease and desist "from committing the specific violations found and from violating the Act 'in any other manner,' " (2) the company is to supply the names and addresses of its employees to the Union every six months for two years and (3) a management official or Board agent is to read the notice of violations publicly. *See id.* at 3-4. However broad its discretion or hefty its expertise, the Board is required to match the cure to the ill; in selecting the remedies noted, however, the Board has vastly overmedicated.

The Board's remedy must be "based on the nature and extent of the violations it finds," *NLRB v. Blake Constr. Co.*, 663 F.2d

272, 285 (D.C. Cir. 1981); *see NLRB v. Express Publ'g Co.*, 312 U.S. 426, 433 (1941) (Board's authority regarding unfair labor practices does not include "authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct"), and, thus, isolated unfair labor practices do "not justify an injunction broadly to obey the statute and thus subject the [violator] to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." *Id.* at 435-36. There is, however, an equally well-established exception to this rule: "substantial evidence of a 'generalized scheme' to violate the Act" would support the sort of broad cease-and-desist order imposed here. *Blake Constr. Co.*, 663 F.2d at 285 (quoting *San Francisco Local Joint Executive Bd. of Culinary Workers v. NLRB*, 501 F.2d 794, 802 (D.C. Cir. 1974)). But the test is a stringent one as " '[s]uch an order is warranted *only* when a [violator] is shown to have a proclivity to violate the Act, or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights.' " *Blake Constr. Co.*, 663 F.2d at 285 (quoting *Hickmott Foods, Inc.*, 242 NLRB No. 177 (1979)) (emphasis added; first alteration in original). Because Federated was a first-time violator, *see Blake Constr. Co.*, 663 F.2d at 285-86; *but see Teamsters Local 115*, 640 F.2d at 399 ("[A]n employer who strikes the first blow hard enough may not need to strike another."), the Board declined to find that the company exhibited any "proclivity" to violate the Act, concluding instead that its "misconduct was sufficiently egregious and widespread to demonstrate a general disregard for the employees' statutory rights." *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 4 n.9. In so concluding, however, the Board failed to take account of (or explain away) the substantial record evidence demonstrating that, even as it committed unfair labor practices, Federated contemporaneously took actions designed

to respect its employees' rights.[5] Nor did the Board, in light of the unexceptional nature of Federated's unfair labor practices and its counterbalancing good conduct, explain how Federated's misconduct was of the kind and degree that the Board has in the past found sufficient to support a cease-and-desist order.[6] The Board observed, and the majority today repeats, *see* Maj. Slip Op. at 17, that Federated committed "extensive and serious unfair labor practices," *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 3, but we have made clear that it is not enough for the Board to justify an extraordinary remedy "simply by reciting the employer's unfair labor practices and commenting on their gravity." *Charlotte Amphitheater*, 82 F.3d at 1079.

Relying on two cases from outside our circuit, the majority concludes that "[g]iven the scope of Federated's communications offensive against the Union, and the multiple unfair labor practices it committed in attempting to prevent the

---

[5] *See* J.A. 41-63 (written communications to employees); J.A. 88-106 (PowerPoint presentation); *see also* discussion *supra* note 4. In its information campaign, Federated consistently stressed that it intended to respect its employees' views on unionization, *see* J.A. 41, 42, 43, 46, 48, 49, 55, 57, 60, 63, 89, 92, 103, 105, 106, and that, if the Union won, bargaining would be "give and take," J.A. 43, 46, 48, 56, 59, 60, 61-63, 94, 100, and pursued in good faith, *see* J.A. 46, 56, 57, 95, and that it would not take retaliatory action, *see* J.A. 55, 56, 57, 62.

[6] *See, e.g., Audubon Regional Med. Ctr.*, 331 NLRB 374 (2000) (extraordinary remedies to lessen effects of employer's (1) discriminatory rule enforcement; (2) threats to close plant, cut jobs and benefits, discriminate and discipline; (3) refusal to negotiate with union; (4) attempts to discourage union support by announcing wage increases and new benefits; and (5) discrimination against employees); *Fieldcrest Cannon, Inc.*, 318 NLRB 470, 473-474 (1995), *enfd.*, 97 F.3d 65, 73 (4th Cir. 1996) (employer "adopted a scorched earth, take-no-prisoners approach").

Union from winning the election, it was reasonable for the Board to conclude that its misconduct was sufficiently persistent and widespread to warrant a broad cease and desist order." Maj. Slip Op. at 17. Neither of the two cases, *see Coil-A.C.C., Inc. v. NLRB*, 712 F.2d 1074, 1076 (6th Cir. 1983); *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 (1st Cir. 1976), nor one of ours that upheld a cease-and-desist order, *see Blake Constr. Co.*, 663 F.2d at 285-86, supports the majority inasmuch as their facts are so markedly different. In *Coil A.C.C., Inc. v. NLRB*, the Sixth Circuit held that the Board was "clearly justified" in finding that the employer "manifested a general disregard for the fundamental statutory rights of its employees" because its owner personally and dramatically confronted two employees about their union sympathies and on three occasions "forewarned that he would cease operations at the plant and renew business operations elsewhere if necessary before he would permit unionism." 712 F.2d at 1075-76; *but see id.* at 1077-78 (Krupansky, J., concurring in part & dissenting in part). The First Circuit's decision in *NLRB v. Union Nacional de Trabajadores* involved misconduct of an exceptionally egregious nature—including multiple violent assaults, *see id.* at 6-9 and numerous death threats, *see, e.g., id.* at 7 (" 'This is Union Nacional and we kill people.' "), against management—which supported a finding not at issue here. *See id.* at 11. There, the court concluded that the administrative record "amply support[ed] the Board's conclusions that the union has demonstrated a *proclivity*" to violate the Act, not only based on its numerous and flagrant violations but also because "[i]ts agents have stated, both in the course of their unlawful activities and in the hearings before the Board, that they do not regard themselves as subject to the authority of the Act and that they feel no obligation to conform their conduct to its requirements." *Id.* (emphasis added).

Our own precedent also stands in strong contrast. In *Blake Constr. Co.*, we explained that the employer's efforts to avoid

negotiating contract pay rates for new union members, which "culminat[ed] in a dramatic, albeit transparent, turnover of all company activities to an alter ego, solely to abrogate its obligations under the Act[,] unquestionably" manifested a general disregard for its employees' rights. 663 F.2d at 285. "This maneuver was exacerbated," the court added, by the employer's approach to individual bargaining with union employees, which entailed "confronting the employees with the Solomonic dilemma of choosing between lower take home pay or slightly higher take home pay which was still appreciably less than the employees' current rates of pay and did not include necessary benefits." *Id.* at 285-86. The court concluded by observing that "[t]he [employer's] conduct . . . and the lengths to which it went to perpetuate that conduct are reminiscent more of the pre-National Labor Relations Act era of industrial warfare than of the latter Twentieth Century." *Id.* at 286. Federated's unfair labor practices hardly evoke the days of "industrial warfare."

The Board likewise failed to justify the need for the two additional extraordinary remedies it prescribed. As the Board noted, Federated must furnish the Union with a list of employee names and addresses before the next election. *Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 4 n.10. But to ensure "that [the Union] can present its message to employees outside the workplace in an atmosphere free from coercion," *id.*, the Board also ordered Federated to supply the names and addresses of its employees to the Union every six months for two years. *Id.* at 4. The Board nowhere explained why such a remedy was necessary—presumably—to counteract employees' fear of discussing unionization at the Tampa facility. *See, e.g., Excel Case Ready*, 334 NLRB 4, 5 (2001) (ordering employer to provide union with employees' names and addresses within one year on finding "usual Board remedies are not sufficient to undo the effects of the [employer's] illegal activities" as it "systematically embarked on a campaign to rid

its work force of leading union adherents"); *Blockbuster Pavilion*, 331 NLRB 1274, 1275 (2000) (ordering employer to provide union with employees' names and addresses within one year on finding it "essential to ensuring that employees may freely exercise their Section 7 rights" as "[t]he employees' prior organizational efforts were aborted by the [employer's] coercive tactics calculated to make employees afraid to associate themselves with the Union."). The majority nevertheless accepts the Board's remedy, reasoning that Federated's challenge fails because "it is long established that requiring the employer to disclose employee names and contact details to the union furthers NLRA objectives 'by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses.' " Maj. Slip Op. at 18 (quoting *NLRB v. Wyman-Gordan Co.*, 349 U.S. 759, 767 (1969)). But another longstanding doctrine requires us to scrutinize the Board's remedy to ensure that it is "tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc.*, 467 U.S. at 900; *see Cobb Mech. Contractors, Inc.*, 295 F.3d at 1375. Here, the Board failed to support the conclusion that necessarily underlies this remedy—*i.e.*, the Union could not communicate effectively with the employees—with record support. *See Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 3-4; *see also id.* at 8 ("[T]he record does not establish that the Union was unable to communicate with the employees.") (Battista, Chrmn., dissenting in part).

The Board's requirement that the notice of violations be read publicly by a management official or Board agent contains a similar defect. We have consistently "viewed public reading requirements with . . . suspicion," *Teamsters Local 115*, 640 F.2d at 402, recognizing the " 'ignominy of a forced public reading' by an employer and its potential for oppression." *United Food*, 852 F.2d at 1348 (quoting *Int'l Union of Elec. Radio & Mach. Workers v. NLRB*, 383 F.2d 230, 234 (D.C. Cir. 1967)). Accordingly, we will not enforce such an order absent

record evidence indicating a "particularized need" for it, *Teamsters Local 115*, 640 F.2d at 403; *see United Food*, 852 F.2d at 1348; *cf. Ishikawa Gasket Am.*, 337 NLRB 175, 176 (2001) ("The reading of the notice by a respondent is an 'extraordinary' or 'special' remedy that will be imposed only where *required* by the particular circumstances of a case.") (emphasis added); the touchstone of the "particularized need" requirement, as our cases make clear, is evidence of a "substantial link[]" between the public reading and the unfair labor practices. *United Food*, 852 F.2d at 1348; *see Teamsters Local 115*, 640 F.2d at 403-04; *Conair Corp. v. NLRB*, 721 F.2d 1355, 1385-87 (D.C. Cir. 1983); *cf. United Food*, 852 F.2d at 1349 ("unique and specific facts of a case will more often than not provide the measure that allows a remedy in one case and precludes it in another"). By requiring a correlation between the misconduct and the public reading, we ensure that the latter is a remedy and not a punishment. *Teamsters Local 115*, 640 F.2d at 403 (concluding that "the negative aspects of the order overwhelm the marginal benefit"); *see United Food*, 852 F.2d at 1348-49. If there was a "substantial link[]" here, *United Food*, 852 F.2d at 1348, the Board failed to identify it. In addition to the public reading, the Board required that the notice of violations be posted in three languages at the Tampa facility. *See Federated Logistics & Operations*, 340 NLRB No. 36, slip op. at 5. The Board Chairman, in dissent and, in my view, correctly, criticized the Board's support for the "particularized need" for a public reading, *see id.* at 8 (Battista, Chrmn., dissenting in part); the Board merely noted that violations were committed by "high-level management officials" and posited that the forced reading was needed "so that employees [would] fully perceive that [Federated] and its managers are bound by the requirements of the Act." *Id.* at 3-4. As the Board has shown no *particularized* need for a public reading "to dispel the atmosphere of intimidation created in large part by [Federated's] own statements and actions," *Conair*, 721 F.2d at 1386-87, the

public reading appears, at least to me, wholly punitive. *See Capital Cleaning Contractors, Inc.*, 147 F.3d at 1009 (remedy must be "truly remedial and not punitive"). While the majority cites the *Teamsters Local 115* rule that a public reading requirement will not be enforced absent a "particularized need," 640 F.2d at 403; *see United Food*, 852 F.2d at 1348, it in truth applies an unprecedented and, I believe, incorrect standard, placing the burden on Federated to "rebut[] the existence of a particularized need for the public reading requirement." Maj. Slip Op. at 19. Because *the Board* failed to meet the burden *it* bears to explain, based on substantial record evidence, how the "extraordinary" remedies are tailored to redress Federated's specific unfair labor practices, *see, e.g., United Food*, 852 F.2d at 1347, I would vacate the remedies. *See Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1068 (D.C. Cir. 2001).

## III.

For the foregoing reasons, I am convinced that the Board provided neither a reasonable explanation nor one based on substantial record evidence to support its conclusion that Federated committed an unfair labor practice by threatening futility if unionization took place. The same goes for the three "extraordinary" remedies it imposed. Because the majority has done no better today in upholding the Board on these two matters, I respectfully dissent from sections II.A and II.D of the majority opinion.